**Ronald Curtis CHAMBERS, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 71532.

Court of Criminal Appeals of Texas.

June 28, 1995.

Roger F. Joyner, Lawrence B. Mitchell—on appeal only—Dallas, for appellant.

John Vance, Dist. Atty. & Pamela Sullivan Berdanier, Dan Haygood, Jerri Sims, Greg Long & Toby Shook, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MALONEY, Judge.

Appellant was convicted of capital murder for a murder committed in the course of a robbery. Tex.Penal Code Ann. § 19.03(a)(2). The jury returned affirmative findings to the two special issues submitted to it and the trial court sentenced appellant to death. Appeal to this Court is automatic.[1] Tex.Code Crim.Proc.Ann. art. 37.071(h).

■ In his first point of error appellant alleges the evidence is insufficient to support the jury's affirmative finding on the second special issue, whether there is "a probability that [appellant] would commit criminal acts of violence that would constitute a continuing threat to society." A discussion of the evidence in a light most favorable to the verdict is necessary to fully address appellant's claim.

On the night of April 10, 1975, Mike McMahan and Deia Sutton, both college students, went to a night club in Dallas to meet some friends and dance. Upon leaving the club and approaching McMahan's car, they noticed four men sitting in the next car. McMahan let Sutton in on the passenger side and as he was getting in on the driver's side, two of the men, appellant and his cohort Clarence Ray Williams, forced their way into the car at gunpoint. Appellant ordered Sutton into the backseat with him. Sutton noticed a shotgun on the floorboard. Williams drove and was followed by the car with the two other men. As they were driving appellant instructed Sutton to give him her purse, coat and watch. McMahan was ordered to take off his trousers; appellant emptied the trousers pockets. Williams drove to the levee on the Trinity River, where Sutton and McMahan were forced from the car and ordered down the embankment. Sutton saw appellant with the shotgun and a pistol, she heard five gunshots, was struck in the back of the neck by a bullet and fell. McMahan

was also struck and rolled down the hill. Appellant and Williams retreated up the hill. McMahan called out to Sutton to see if she was alright. Sutton heard Williams say "Hey, man, they're not dead" and appellant respond "They gotta to be dead. I shot 'em in the head." Williams and appellant came back down the hill. Appellant struck McMahan ten to twenty times in the head with the barrel of the shotgun, and ordered Williams to take Sutton into the water. Williams pulled Sutton to the water and attempted to choke and drown her. When appellant finished beating McMahan he came toward Sutton. She begged him not to kill her; he raised his shotgun over his head and struck her three times. She was left for dead, but survived. McMahan died as a result of multiple blows to the head; he had also suffered a punctured lung and two gunshot wounds.

Following the above, appellant and two of his cohorts went to the home of Nanny Jones. There, appellant washed blood and hair off the shotgun and the others attempted to burn Sutton's and McMahan's credit cards. Appellant wiped blood from the stolen money and divided it between them. Jones' thirteen-year-old daughter[2] testified that appellant and one of his friends played dominoes and appellant seemed to be in a good mood. She also testified that she braided appellant's hair during the game. Thereafter appellant went upstairs and went to sleep.

During the punishment phase of trial the State presented evidence establishing that several days prior to the instant offense appellant was caught by a security guard while breaking into and damaging a washateria at an apartment complex. The officer who arrested appellant for that offense testified that at the station appellant was "laughing, joking, carefree" and stated that he would be out before the officer could finish writing up his report. There was also evidence that

---

1. This appeal is from appellant's third conviction for this offense. Appellant's original conviction was affirmed by this Court on direct appeal, *Chambers v. State*, 568 S.W.2d 313 (Tex.Crim. App.1978), *cert. denied*, 440 U.S. 928, 99 S.Ct. 1264, 59 L.Ed.2d 484 (1979), but the judgment was vacated on habeas corpus, *Ex parte Chambers*, 688 S.W.2d 483 (Tex.Crim.App.1984), *cert.*

*denied*, 474 U.S. 864, 106 S.Ct. 181, 88 L.Ed.2d 150. Appellant's second conviction was reversed on direct appeal. *Chambers v. State*, 784 S.W.2d 29 (Tex.Crim.App.), *cert. denied*, 496 U.S. 912, 110 S.Ct. 2602, 110 L.Ed.2d 282 (1989).

2. She was thirteen at the time of the offense.

appellant was subject to approximately 25 disciplinary actions during his 17 years in the penitentiary following his first conviction for this offense, involving such matters as refusing to obey orders, use of vulgar language and creating disturbances. In one incident appellant was charged with threatening harm to a prison officer. There was evidence presented that prison mail room records showed books and magazines arriving for appellant on such subjects as bestiality, sadomasochism and incest. Timothy Keith, a supervisor at the Texas Department of Criminal Justice ("TDCJ"), testified that during his seven years working on death row he had observed appellant "cussing guards, threatening, making threatening gestures ... [displaying] aggressive behavior towards the staff." He also testified that it is TDCJ policy to try and resolve such problems informally and that a report is filed only if verbal discussions are ineffective. Keith testified that if 25 reports were filed, there would have been many more incidents that were not written up. Keith further testified that appellant was dangerous, manipulative, "represent[ed] himself to be aggressive, especially to someone who's a smaller person" and would constitute a continuing threat to society.

We have recently clarified our role as a reviewing court in considering sufficiency of the evidence in a capital case:

> [A]s an appellate court, our task is to consider all of the record evidence and reasonable inferences therefrom in the light most favorable to the jury's verdict and to determine whether, based on that evidence and those inferences, a rational jury could have found beyond a reasonable doubt [the elements of the offense or the special issue under consideration]. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1973). Thus, our review is a very limited one. We do not act as a thirteenth juror re-evaluating the weight and credibility of the evidence. Rather, we act only "as a final, due process safeguard ensuring ... the rationality of the factfinder." *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App.1988).

*Wilkerson v. State*, 881 S.W.2d 321, 324 (Tex. Crim.App.), *cert. denied*, —— U.S. ——, 115 S.Ct. 671, 130 L.Ed.2d 604 (1994); *see also Burns v. State*, 761 S.W.2d 353, 356 n. 4 (Tex.Crim.App.1988) ("we have abandoned any pretense of this Court balancing mitigating and aggravating evidence"). *Compare Wilkerson*, 881 S.W.2d at 328–44 (Baird, J., dissenting) (urging Court to balance aggravating and mitigating evidence in reviewing sufficiency claims in capital cases).

The facts of the instant offense were particularly brutal. Appellant and his cohorts waited in the parking lot of a nightclub for the opportunity to apprehend and rob unsuspecting victims. Upon apprehending and robbing the victims, they drove directly to the levee for the purpose of eliminating the victims as witnesses. The testimony of the medical examiner, Dr. Vincent DiMaio, revealed the brutal nature of McMahan's murder, which was witnessed by Sutton. DiMaio described 10 "wound complexes" [3] to McMahan's head. The most severe wound he described as follows:

> Then, in the lower part of the back of the head, running from approximately midline in a horizontal path toward the front of the head, was the largest wound, a large, gaping tear in the scalp that measured four inches long by one and a half inches wide. You could see through this gaping tear in the scalp into the cranial cavity, you could see the brain. And what had happened was there had been a blunt-force blow here and the bone underneath had been fragmented, part of it had fallen out, and part of the bone had been driven into the brain, creating this hole.

DiMaio explained that this type of laceration could only be caused by a "[t]remendous amount of force":

> This is one of the thickest areas of the skull, back here. The whole head was caved in and the bone was broken into little fragments, in splinters. And, in fact, the hole was bigger than the hole in the scalp. The hole in the bone actually measured four by two and a half inches.

---

**3.** DiMaio explained that although some of the "wound complexes" actually consisted of a bruise with two lacerations, they were counted as a single "wound complex."

The evidence also showed that the barrel of the shotgun used to beat McMahan was bent. DiMaio agreed that there could have been more than 10 blows to the head, as some could have struck the same area repeatedly resulting in a single wound complex. DiMaio further testified that he had determined that McMahan "was alive at the time he received every one of the blows" and stated that the blows would have been tremendously painful.

The evidence showed that appellant was the person in charge. Sutton testified appellant gave all of the orders and was the party in possession of the guns. After the offense, appellant divided up the money. He was jovial and stated that McMahan had a hard head and that he had started to rape Sutton.[4] Appellant's lack of remorse was demonstrated in his casual manner and ability to play dominoes and have his hair braided immediately following the offense.

Finally, although there was no evidence of adjudicated offenses, there was evidence of appellant's belligerent and aggressive character, as demonstrated by the numerous disciplinary reports in prison.

The facts of the instant case are remarkably similar to the facts in *King v. State*, 631 S.W.2d 486, 504 (Tex.Crim.App.1982). There, two young persons, the deceased and his female companion, were accosted outside a nightclub in Houston by the defendant and a cohort. They were forced into the defendant's vehicle. The defendant and his friend took their money and began driving around discussing whether to kill both of them or just the deceased. Upon deciding to kill only the deceased, the defendant stopped the truck and beat the deceased in the head with a shotgun, causing his death. The deceased's companion was forced to watch the beating;

she was thereafter repeatedly sexually assaulted. We held that the circumstances of the offense itself could have sustained the jury's affirmative answer to the second special issue.[5] *King*, 631 S.W.2d at 504.

The calculated and cold-blooded nature of the instant offense, the random apprehension and robbery of two victims, appellant's execution-style shooting of Sutton and McMahan as they walked hand-in-hand down the embankment away from appellant, the brutal beating of McMahan while Sutton looked on, the relentless attempts to murder Sutton (first by shooting, then by drowning and choking, and finally by beating), appellant's orchestration of the offense, his lack of remorse and the casual manner in which he returned to his affairs immediately thereafter, his belligerent and aggressive conduct in prison, and the opinion of a prison official that appellant was dangerous and would constitute a continuing threat to society, together amounts to sufficient evidence upon which a rational jury could conclude appellant would constitute a continuing threat to society. *See, e.g., Johnson v. State*, 853 S.W.2d 527, 532–33 (Tex.Crim.App.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 154, 126 L.Ed.2d 115 (1993) (evidence sufficient to support second issue based on shooting of two victims in course of burglary because "dead men don't talk"; one victim shot while on knees pleading for mercy); *Turner v. State*, 698 S.W.2d 673, 676 (Tex.Crim.App. 1985) (op. on reh'g) (defendant's planning of robbery of store where he was previously employed, defendant's "coolly" carrying out of offense, choking of store clerk with hemp rope, lack of remorse, evidence that defendant went AWOL from Army, and evidence of unadjudicated escape attempt involving

---

4. These statements were testified to by Larry Bickems, one of the men who followed in the other car behind appellant, and who went to Nanny Jones' house after the offense.

5. The State also put on evidence of an extraneous unadjudicated rape and prior burglaries. In response to the defendant's contention that the burglaries were not crimes of violence against persons and that the State had failed to prove that the defendant raped the extraneous offense witness, we concluded that the facts of the offense alone would have been sufficient to sustain

the jury's affirmative answer. *King*, 631 S.W.2d at 503–04. We said:

> Considering the random selection of [the defendant's] young victims, the calculated, remorseless brutality of the manner in which he obliterated another human life and the levity with which he exploited the terror he generated in the female witness to this atrocity, this Court cannot say that the jury would have been unjustified in returning their verdict of "yes" to the second special issue based alone on the facts of the offense.

*Id.* at 504.

defendant and several other inmates supported affirmative finding on second issue); *King*, 631 S.W.2d at 503–04. Appellant's first point of error is overruled.

In his second point of error appellant claims the trial court erred in excusing venireperson Robert S. Brewer, II. On his juror questionnaire Brewer indicated that he had been convicted of four counts of a federal misdemeanor for failure to file a tax return with the Internal Revenue Service. In response to questions by appellant during voir dire Brewer stated that he was convicted for these offenses in a jury trial in 1982, was sentenced to two years, and served "2 on 2 concurrent" and a year and six months in prison and four months in a halfway house.[6] Brewer reiterated that the offenses were federal misdemeanors. The State contended that Brewer was disqualified and offered as an exhibit Brewer's "NCIC computer printout" which reflected that Brewer had been convicted of a single charge of "failure to file income tax" and sentenced to two years confinement. Appellant argued that Brewer was not disqualified because the offenses at issue were misdemeanors rather than felonies. The court excused Brewer on the ground that he was disqualified.

Article 35.16(a)(2) of the Code of Criminal Procedure provides in part that

A challenge for cause may be made . . . for any one of the following reasons:

\* \* \* \* \* \*

2. That he has been convicted of theft or any felony[.]

Article 35.19, *Absolute Disqualification,* provides that

No juror shall be empaneled when it appears that he is subject to the second, third or fourth cause of challenge in Article 35.16, though both parties may consent.

▉ We apply an abuse of discretion standard when reviewing a trial court's ruling on an absolute disqualification. *Hammond v. State*, 799 S.W.2d 741, 744–45 (Tex. Crim.App.1990) (abuse of discretion standard applicable to trial court's rulings on challenges for cause and determinations of absolute disqualification), *cert. denied*, 501 U.S. 1259, 111 S.Ct. 2912, 115 L.Ed.2d 1076 (1991). Moreover, a trial court's ruling on an absolute disqualification is a question of fact. *Id.* In *Hammond, supra,* the defendant complained that the trial court erred in failing to grant the State's challenge for cause against a venireperson who he claimed, on appeal, that the record showed to be absolutely disqualified. While the defendant contended the venireperson was disqualified because he was convicted of a theft, the evidence was unclear as to whether the venireperson had actually been convicted.[7] We said:

Whether [the venireperson] was absolutely disqualified, however, was a question of fact to be resolved by the trial court in the first instance. Article 35.21, V.A.C.C.P. Especially in view of the absence either of an admission from the venireman that she had been convicted of theft, or a judgment of conviction reflecting same, it was within the province of the trial court to find as an historical fact that the venireman had not been "convicted of theft" for purposes of Article 35.16(a)(2), supra. *Given "evidence . . . which might be called conflicting," a trial court has discretion to find, or for that matter refuse to find, facts such as*

---

6. Brewer's testimony as to his sentence was not altogether clear:

Q. Do you remember what punishment you got for that?
A. Six months in the basement—or what turned out to be 6 months in [sic] basement. I got a 2-year sentence.
Q. You got 2 years, but did 6 months?
A. I did 2 on 2 concurrent and a year 6 months at Big Springs and 4 months in the halfway house.

7. The State produced an arrest record showing that the venireperson had been arrested for shop-

lifting. The report showed "disposition" as payment of $25.00. The venireperson testified that she had been charged with shoplifting, that she had been bailed out upon payment of $25.00 and that she had never entered a plea in the case. The corporation court's docket book indicated that a plea of guilty was entered; however, no judgment form had been completed and signed. The trial court stated that the question "boils down to, can you have a conviction without a judgment in a corporation court case[?]" *Hammond*, 799 S.W.2d at 744.

*would justify a challenge for cause. [citations omitted] This must be so even though the purported basis of the challenge constitutes an absolute disqualification under Article 35.19, supra.*

*Id.* (emphasis added).

Appellant points to 26 U.S.C. § 7203, as evidence that the failure to file a tax return is a misdemeanor offense. This provision provided at the time of Brewer's conviction that the willful failure to file a tax return was a misdemeanor and subject to a fine and/or imprisonment of "not more than one year." The United States Code also provided at the time of Brewer's conviction:

(1) Any offense punishable by death or imprisonment for a term exceeding one year is a felony.

(2) Any other offense is a misdemeanor.

18 U.S.C. § 1 (1982).

The question is whether the trial court abused its discretion in finding as a historical fact that Brewer was convicted of a felony and therefore absolutely disqualified as a juror. We initially point out that the language of article 35.19 does not require undisputable certainty on the part of the trial court in making its determination on absolute disqualifications. Rather, article 35.19 provides that if it "appears" that the venireperson is absolutely disqualified, then he "shall not be empaneled[.]" This is consistent with our holding in *Hammond* that such a determination is a fact issue and that if the evidence can be said to be conflicting, we will not say that there has been an abuse of discretion.

The record reflects that at the time of its ruling the trial court had before it Brewer's testimony that he was convicted of four counts of failure to file a tax return, a misdemeanor, his conflicting testimony that he was sentenced to two years and actually served two years and a year and six months in prison, n. 6 supra, and the NCIC printout reflecting that Brewer was convicted of a single offense of failure to file and sentenced to two years confinement. Although the United States Code as it existed at the time of Brewer's conviction provided that failure to file a tax return was a misdemeanor pun-

ishable by imprisonment of not more than one year, it also defined a felony as any offense punishable by imprisonment of more than one year. None of the court records from Brewer's trial were presented into evidence. In view of the NCIC printout reflecting that Brewer was convicted of a single offense and sentenced to two years imprisonment, and Brewer's own testimony indicating that he was sentenced to two years and served more than two years confinement, *see* n. 6, supra, and the federal law defining a "felony" as an offense punishable by a term of imprisonment of more than one year, we cannot conclude the trial court abused its discretion in finding Brewer absolutely disqualified and excusing him. *Accord Hammond,* supra. Appellant's second point of error is overruled.

In his third point of error appellant claims the trial court erred in denying his challenge for cause against venireperson John Melton. During voir dire appellant questioned Melton about mitigation. Appellant points to the following exchange:

[Appellant]: What about, let's say the person was drunk at the time of the offense, would that mitigate it some? To some people that's mitigating, some people it's not?

[Melton]: I think even if you're drunk to the point that you don't know where you are or what you're doing, that you're not going to do anything that—I think your subconscious still runs what you do.

Q: Even though you were so drunk that you didn't know what was happening and you didn't know what you were doing was wrong, you didn't appreciate the wrongfulness of your conduct, at least consciously, that wouldn't be mitigating?

A: No, I don't think so. I don't think you can be that drunk and deliberately and intentionally commit murder.

Appellant challenged Melton for cause in part on the ground that he would not consider intoxication as mitigating evidence, even if it showed that the defendant was temporarily insane. The trial court denied appellant's challenge and appellant exercised a peremptory strike.

Appellant argues that "[e]vidence of an accused's voluntary intoxication is mitigating as a matter of law and must be considered as such by a venire person." He contends Melton was disqualified for having a bias or prejudice against a phase of the law upon which he was entitled to rely. We disagree. We have never held that evidence of intoxication is mitigating as a matter of law. *Cf. Taylor v. State,* 885 S.W.2d 154 (Tex.Crim.App.1994) (discussing penal code section 8.04 which provides that temporary insanity caused by voluntary intoxication may by offered in mitigation of punishment). Even if it were the law that such evidence must be considered mitigating, a venireperson is not shown to be biased or prejudiced against the law unless that law has been explained to them. In *Teague v. State,* 864 S.W.2d 505, 513 (Tex.Crim.App.1993), a venireperson stated that he would not consider the defendant's age to be a mitigating factor. We rejected the defendant's contention that the venireperson was challengeable for cause due to his bias against the law:

> A trial court abuses its discretion in overruling a challenge for cause to a venireperson who cannot follow the law. [citation omitted] The law requires a juror at least to consider youth as a mitigating factor in answering the special issues. [citation omitted] Here, however, [the venireperson] was not informed the law required him to consider youth or age in mitigation of punishment. Therefore, appellant cannot demonstrate [the venireperson] had a bias against this phase of the law.

*Id.* Here, Melton stated that in his personal opinion evidence of voluntary intoxication was not mitigating, but he was never informed of any law requiring him to consider such evidence as mitigating. Accordingly, appellant has failed to show that Melton was biased or prejudiced against the law. Appellant's third point of error is overruled.

In his fourth point of error appellant claims the trial court erred in overruling his motion to quash the subsequent jury panel selected from the general venire on the ground that the trial judge before whom the case was tried did not personally determine the excuses and disqualifications of those summoned initially to the central jury room.[8]

During voir dire, the trial judge determined that the special venire that had been summoned for this case would not provide enough prospective jurors for selection, and ordered additional veniremembers to be drawn from the general venire awaiting selection to the various cases set for trial. Excuses and disqualifications of the veniremembers from which the second panel was selected had been ruled upon by the central jury room judge.[9] Some excuses had been allowed by district clerk personnel without the summoned person having to make an appearance. Appellant objected to this procedure and motioned to quash the panel, contending that the trial court is required to personally rule on excuses and disqualifications of prospective jurors. Appellant cites Tex.Code Crim.Proc.Ann. arts. 35.03 and 35.21, and contends these provisions are mandatory and violation thereof is harmful per se.[10]

Article 35.03, subsection (1) provides in part that "the court shall then hear and determine excuses offered for not serving as a juror" and may discharge jurors or postpone their service accordingly. Subsection (2) provides that under a plan approved by the commissioner's court of the county, *"in a case other than a capital felony case,* the court's designee may hear and determine an excuse" and postpone a juror's service. (emphasis added). Article 35.21 provides that "[t]he court is the judge, after proper examination, of the qualifications of a juror, and shall decide all challenges without delay and without argument thereupon." While appel-

**8.** Appellant also complains about "exemptions," but he fails to cite authority or present argument with respect to rulings on "exemptions." At any rate, such argument would be fallacious, as a summoned juror can establish an exemption by simply filing a signed statement with the clerk of court. Tex.Code Crim.Proc.Ann. art. 35.04.

**9.** Appellant called the chief clerk from the central jury room who testified to the procedures in the central jury room, including the ruling on excuses and qualifications by the central jury room judge.

**10.** Appellant also cites article 33.03, but that article relates to his next point of error.

lant's argument is not clearly stated, we understand him to argue that "the court," as that term is utilized in articles 35.03 and 35.21, refers to the trial judge not the central jury room judge, and that under subsection (2) of article 35.03 designees may make decisions on excuses only in noncapital cases.

We first note that the trial judge did in fact have the opportunity and did hear and rule on excuses and qualifications of those venirepersons who were assigned to appellant's case from the central jury room and who appeared before her in appellant's case. Nothing in the plain language of the provisions cited by appellant requires his trial judge to make rulings with respect to venirepersons *summoned to the central jury room that have not yet been assigned to appellant's case.*

Under Government Code section 62.016, the central jury room judge has authority to rule on excuses of prospective jurors; no mention is made of the hearing and ruling on disqualifications.[11] Article 35.03 also pertains to excuses. According to appellant's argument, article 35.03 would never permit a central jury room judge to hear and determine excuses in the central jury room, but would always require the trial judge in each particular case to come into the central jury room and make those decisions. In *Esquivel v. State*, 595 S.W.2d 516 (Tex.Crim.App.), *cert. denied*, 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980), a capital murder case, the defendant sought to have the trial court test the excuses and qualifications of prospective jurors in the jury assembly and pick the entire panel from which the defendant's jury would be selected. The following procedure was followed in that case:

> ... before the panels were brought into the courtroom, each member was tested as to his or her qualifications to serve and excuses were heard and ruled upon. This preliminary examination took place in the jury assembly room to which all prospective jurors were ordered to report. Once the panel of 24 or 25 prospective jurors arrived in the courtroom they were further

questioned by the trial court pursuant to Art. 35.17(2) V.A.C.C.P.

*Id.* at 521. We held the trial court properly rejected the defendant's request. *Id.*

The language in subsection (2) of article 35.03, providing that the court's designee may make decisions on excuses in cases *other than* capital felony cases is troubling. However, when viewed in the context of the jury formation process, we again cannot conclude that this language would prohibit the general assembly judge from designating personnel to make such decisions. This is because at the time the summoned jurors apply for excuses, they have not been assigned to any particular case. There is no way of knowing what kind of case the prospective jurors would subsequently be assigned to, capital or noncapital. We construe this language, as the State contends, as referring to the distinction between a special venire and the formation of panels through a general assembly. In the case of a special venire called in a capital case, the trial judge cannot designate others to make decisions with respect to excuses. Here, the potential jurors who were granted excuses by court designees were general assembly veniremembers and were not assigned to appellant's or any particular case.

As to appellant's complaint pertaining to article 35.21, again, nothing in the plain language of that article requires a trial court to rule on qualifications of prospective jurors summoned to the central assembly. The trial judge in this case heard and ruled on qualifications of the venirepersons who came before her. Appellant does not claim the central jury room judge exceeded his authority in ruling on qualifications of persons in the central assembly under Government Code § 62.016. Appellant's fourth point of error is overruled.

In his fifth point of error appellant claims the trial court erred in hearing and ruling on excuses and disqualifications of venirepersons in appellant's absence.[12] Ap-

---

11. Appellant does not complain of a violation of section 62.016.

12. After exhaustion of the special venire, the trial court ordered two more panels from the general assembly. While excuses and qualifications were

pellant argues that the trial court essentially conducted a portion of voir dire in his absence, in violation of Tex.Code Crim.Proc. Ann. art. 33.03.[13]

Article 33.03 provides in relevant part that "[i]n all prosecutions for felonies, the defendant must be personally present at the trial[.]" The question is whether a defendant's "trial" includes jury panel formation during the general assembly. We conclude it does not.

We are aware of no case from this Court that discusses, in the specific context of article 33.03, what constitutes "the trial." We cannot agree that the formation of jury panels during the general assembly is a part of a defendant's "trial." The prospective jurors who are summoned to a general assembly have not been assigned to any particular case. The judge presiding over the general assembly is assigned for that purpose only at that time and has no given case in mind. This portion of the jury formation process cannot be said to be part of a particular defendant's trial. Accordingly, article 33.03 does not require the defendant's presence at the taking of excuses and qualifications during the general jury assembly. Appellant's fifth point of error is overruled.

 In his sixth, seventh and eighth points of error appellant complains of the trial court's failure to order the court reporter to record the hearing and deciding of excuses, exemptions and disqualifications of prospective jurors in the general assembly. Appellant argues that since the record fails to contain that portion of the voir dire, it is incomplete and he is entitled to a new trial.

Rule of Appellate Procedure 11 provides in part that the duties of the official court reporter include "making a full record of jury arguments and voir dire examinations when requested to do so by the attorney for any party to a case, together with all objections to such arguments, the rulings and remarks of the court thereon[.]" [14] Article 35.17 of the Code of Criminal Procedure, *Voir Dire Examination*, provides for two different methods of voir dire examination. In the first method, the parties "shall conduct the voir dire examination of prospective jurors in the presence of the entire panel." The second method, applicable in capital cases, permits the parties to "examine each juror on voir dire, individually and apart from the entire panel." "Panels" are referred to as the group of prospective jurors that are assigned to the trial court from the central jury assembly. *Hall v. State,* 661 S.W.2d 113, 115 (Tex.Crim.App.1983); *see also Vines v. State,* 479 S.W.2d 322 (Tex.Crim.App.1972) (speaking of voir dire examination as questioning of panel by parties). Under the Code of Criminal Procedure "voir dire examination" refers to the examination of prospective jurors *after* they have been assigned to a particular court and case from the general assembly. We cannot conclude the trial court abused its discretion in failing to direct its court reporter to record the questioning of prospective jurors in the general assembly. Points of error six, seven and eight are overruled.

 In his ninth and eleventh points of error appellant claims the trial court erred in overruling his objection to the admission at punishment of evidence of an unadjudicated extraneous offense. During the punishment phase of trial the State introduced testimony that appellant had participated in the burglary of a coin operated machine at a washateria, an unadjudicated offense. Appellant argues in his brief that this evidence was not

---

13. Appellant also claims his absence violated his right of confrontation under the Sixth and Fourteenth Amendments to the United States Constitution. However, other than stating that "the accused's right to be present at trial is actually an extension of his right of confrontation as guaranteed by the Sixth and Fourteenth Amendments" and citing one case for that bare proposition, appellant makes no argument and cites no authority in support of his claim that he had a constitutional right to be present at the questioning of the general assembly.

ruled upon by the general assembly judge as to the first panel, the trial judge herself, as the general assembly judge on that day, ruled on excuses and disqualifications as to the second such panel. Appellant complains of his absence during these rulings.

14. Prior to trial appellant filed a Motion for the Court to direct the Court Reporter to Record Specified Testimony, requesting in part that the court instruct the Court Reporter to record "[t]he entire *voir dire* examination of the jury panel of prospective jurors."

relevant because the extraneous offense was committed seventeen years prior to the instant trial and therefore it was "too remote to have any relevance to the jury in determining whether appellant would be a future threat[,]" particularly in view of the lack of other evidence of criminal misconduct occurring during those seventeen years. Appellant also claims that due to the remoteness of the extraneous offense, its probative value is outweighed by its prejudicial effect.

At trial appellant objected to the admission of the evidence on several grounds, none of which raised the specific issue of the remoteness in time of the offense.[15] We have repeatedly held that an objection at trial that does not comport with the complaint on appeal presents nothing for review. *See, e.g., Butler v. State,* 872 S.W.2d 227, 236 (Tex. Crim.App.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1115, 130 L.Ed.2d 1079 (1995) (objection at trial that confession was involuntary based on question of *Miranda* warnings did not comport with argument on appeal that confession was coerced); *Camacho v. State,* 864 S.W.2d 524 (Tex.Crim.App.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994) (hearsay and relevancy trial objections did not preserve appellate claim based on extraneous offense under Rule 404(b)). We have stated, "[a]n objection stating one legal theory may not be used to support a different legal theory on appeal." *Camacho,* 864 S.W.2d at 533. Points of error nine and eleven are overruled.

In his tenth point of error appellant claims his counsel was ineffective in failing to question a venireperson during voir dire who ultimately served on the jury. Venireperson Darold Stidham was questioned on voir dire by the trial court and by the prosecutor. When given the opportunity to question Stidham, defense counsel stated, "You're one of the few people we have had who have their— that's made their position absolutely clear and I don't have any questions for you." Neither party utilized any strikes or challenges against Stidham and he subsequently served on the jury.

In establishing ineffective assistance of counsel, the burden is on the defendant to show that counsel's performance fell below an objective standard of reasonableness and that but for counsel's deficient performance the result of the proceedings would have been different.[16] *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also Jackson v. State,* 877 S.W.2d 768, 771 (Tex.Crim.App.1994). Further, "a

---

15. The following objections were made relating to the date of the offense and Rule 403, but neither raise the specific remoteness issue argued by appellant in this appeal:

> ... we would show the Court that the Defendant is not guilty of this offense as a matter of law, in that the statute of limitations for any offense under which he could have been charged concerning this matter ran approximately—well, at least 10 years ago, and, therefore, he could not presently be charged, and therefore, to offer such evidence at this time would defeat the very purpose of the law prohibiting the Defendant from being tried for an offense once the statute of limitations has been run—has run.
> We further object on the grounds, your Honor, that the offense does not prove in any manner that Question No. 2 should be answered "yes," and that would be the sole reason for admitting this evidence in that it doesn't show the Defendant committed any act of violence towards any person, and, therefore, to admit this before the jury would be highly prejudicial and the prejudicial value would greatly outweigh any probative value, in violation of Rule 403 of the Rules of Criminal Evidence.

16. Appellant argues that the proper standard by which to measure effectiveness of counsel at voir dire in a capital case is set forth in *Ex parte Duffy,* 607 S.W.2d 507 (Tex.Crim.App.1980), rather than the standard set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We have held that the *Strickland* standard applies to the guilt/innocence phase in capital and noncapital cases and to the punishment phase in capital cases; *Duffy* applies to the punishment phase in noncapital cases. *Id.* We have specifically applied *Strickland* to ineffective assistance of counsel claims arising from alleged errors during voir dire. *Derrick v. State,* 773 S.W.2d 271, 274 (Tex.Crim.App.), *cert. denied,* 493 U.S. 874, 110 S.Ct. 209, 107 L.Ed.2d 162 (1989) (applying *Strickland* standard to defendant's claim that counsel failed to object to the State's "manufacture" of grounds for excluding venirepersons, effectively giving the State five additional peremptory strikes). Even in noncapital cases involving claims of ineffective assistance arising from error in voir dire, we apply *Strickland. Jackson v. State,* 877 S.W.2d 768 (Tex.Crim.App.1994) (applying *Strickland* standard to claim that counsel was ineffective for failing to challenge a venireperson who served on the jury).

court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *see also Jackson,* 877 S.W.2d at 771 (quoting *Strickland*).

■ Appellant points to Stidham's jury questionnaire which he claims "revealed that [Stidham] strongly favored the use of the death penalty" and that his brother was a police officer. Appellant also contends that Stidham's responses to the State's questions indicated that he "seemed to be a strong proponent of the death penalty[,]" that he would answer the special issues "yes" based upon the facts alone and that he did not need to hear evidence about the defendant's background in resolving special issue two. Appellant argues that "it cannot be said to be sound trial strategy to allow a person to serve as a juror in a capital murder prosecution without trial counsel conducting any questioning of that person."

The record reveals that on his jury questionnaire form,[17] Stidham selected the second of six choices as best representative of his feelings regarding the death penalty:

I believe that the death penalty is appropriate in some murder cases and I could return a verdict in a proper case which assessed the death penalty.

The first choice stated a belief that the death penalty was appropriate in all murder cases and the third choice stated a belief that the death penalty should not be invoked but since the law provides for it, the juror could assess it under the proper facts. The fourth and fifth choices stated an inability to ever render a verdict that would assess the death penalty. The sixth choice stated "none of the above." Stidham responded "yes" to the next question posed on the questionnaire: "If you are in favor of the death penalty in some murder cases, do you agree that a life sentence, rather than the death penalty, would be appropriate under the proper circumstances?" In response to the State's ques-

tioning of his feelings regarding the death penalty, Stidham responded that he would be able to render a verdict imposing it, but also that he did not "believe in all cases it's called for. . . ." He also agreed that he would follow the jury instructions and require the State to prove exactly what the instructions required. When asked about answering the second special issue, Stidham stated that he "would want to know a little bit more about his background." However, he agreed that he could answer the second issue based on the facts of the crime alone, if bad enough, but further stated that it would be "difficult" to convince him on the facts alone.

The only indication on the record as to why defense counsel did not question Stidham is his statement that Stidham had made his positions clear. While Stidham's testimony indicated that he would be willing to answer the special issues "yes" in the appropriate circumstances, they also reflected that he would be willing to answer the issues "no" if he were not convinced that the State had proven its case. We see nothing in Stidham's testimony that would subject him to a challenge for cause from appellant, and appellant does not point to anything. We can only speculate that counsel was apparently convinced that Stidham answered the State's questions so honestly, directly and unequivocally that he would gain no further insight by additional questioning. Perhaps counsel concluded that Stidham was not challengeable for cause, that based upon his demeanor and his straightforward manner of responding to the questions that were asked by the State that he would not reveal anything through questioning by defense counsel that would subject him to a challenge for cause, and that he had already had some notion of other venirepersons whom he expected to have to use peremptory strikes against. Perhaps defense counsel had determined based on some of the information on the jury questionnaire that Stidham was an attractive candidate for the defense. The State suggests in its brief that Stidham shared a number of characteristics with appellant—he was approximately the same age as appellant, was self-employed as a painter which was a job appellant had

---

17. Stidham's jury questionnaire is included in the record as part of the transcript.

held, and had low to moderate income. It is possible that counsel simply felt he had obtained a reliable and adequate picture of Stidham based on his questionnaire and the State's voir dire to be able to make a decision as to his suitability as a juror. Counsel may have believed that his decision to decline to question Stidham would impart a favorable impression. Of course all of this is mere speculation. We do not know on the basis of the record exactly why counsel chose not to question Stidham. Therefore, we cannot say that appellant has overcome the presumption that counsel's failure to do so did not fall within the wide range of reasonable professional assistance. *See Jackson*, 877 S.W.2d at 771 (due to lack of evidence in record as to counsel's reasons for not challenging or striking venireperson who stated his impartiality would be affected by virtue of his experience as robbery victim, court was unable to conclude counsel's performance was deficient). Appellant's tenth point of error is overruled.

In his twelfth point of error appellant claims the trial court erred in failing to provide a verdict form for the jury in the event they were unable to answer any special issue. Appellant contends the jury should have been provided with a form by which they could indicate their inability to reach a verdict on the special issues. We have addressed and rejected identical claims. *See, e.g., Robertson v. State*, 871 S.W.2d 701, 709–10 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 115 S.Ct. 155, 130 L.Ed.2d 94 (1994) (and cases cited therein); *Moreno v. State*, 858 S.W.2d 453, 459–61 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 114 S.Ct. 445, 126 L.Ed.2d 378 (1993) (and cases cited therein). We decline to overrule our decisions in this regard. Point of error twelve is overruled.

In his thirteenth and fourteenth points of error, appellant claims the trial court committed fundamental error by failing to instruct the jury that certain factors are mitigating as a matter of law and by failing to instruct the jury as to the weight which should be given to those factors. In his seventeenth point of error, appellant contends Tex.Code Crim.Proc.Ann. art. 37.071

was unconstitutional as applied [18] to him in violation of the Eighth and Fourteenth Amendments. Appellant makes these claims with regard to his youth at the time of the commission of the offense and his good behavior in prison for the seventeen years between his first conviction and his third trial.

Appellant did not object to the jury instructions at trial. Therefore, with regard to the thirteenth and fourteenth points of error, appellant must show that: "the error is so egregious and created such harm that he 'has not had a fair and impartial trial'—in short 'egregious harm.'" *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1984). Appellant does not meet his burden on these two points of error because the instruction given comports with the Eighth and Fourteenth Amendments of the United States Constitution. Further, in light of Supreme Court precedent, appellant does not show that the statute was unconstitutionally applied in his case.

In *Robertson*, this Court overruled two points of error nearly identical to appellant's thirteenth and fourteenth points. In that case, we pointed out:

[e]ach juror may or may not believe certain evidence is mitigating; however, the constitution *only* requires that where a juror believes there is relevant mitigating evidence, that juror must have a vehicle to give his or her reasoned moral response to such evidence.

*Robertson*, 871 S.W.2d at 712 (emphasis added). We also pointed out that "we have held that appellant 'is not entitled to jury instructions specifically informing the jury that certain evidence may be considered or how it may be applied.'" *Id.* (citing *Lane v. State*, 822 S.W.2d 35, 39 (Tex.Crim.App.1991), *cert. denied*, 504 U.S. 920, 112 S.Ct. 1968, 118 L.Ed.2d 568 (1992)). Further, as we noted in *Robertson*, the state legislature has specifically prohibited the trial judge from instructing the jury on the weight to be given any evidence. Tex.Code Crim.Proc.Ann. art. 36.14 (West 1981 and Supp.1995) ("the judge shall ... deliver to the jury ... a written

---

**18.** Appellant does not contend art. 37.071 is *facially* unconstitutional. The Supreme Court has

held the statute facially valid. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

charge ... not expressing any opinion as to the weight of the evidence....").

With regard to appellant's seventeenth point of error, the Supreme Court has specifically held that the mitigating issue of youth is adequately considered within the second special issue. *Johnson v. Texas,* —— U.S. ——, ——, 113 S.Ct. 2658, 2669–71, 125 L.Ed.2d 290 (1993). The Supreme Court has also held that the special issues provide an adequate vehicle for the jury to weigh appellant's prison disciplinary record. *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 2329–30, 101 L.Ed.2d 155 (1988).

Accordingly, appellant's thirteenth, fourteenth, and seventeenth points of error are overruled.

In his fifteenth point of error appellant claims the trial court erred "in failing to instruct the jury that the concurrence of ten jurors was sufficient to find mitigating evidence that the defendant should be sentenced to life rather than death." In his sixteenth point of error appellant claims the trial court erred in failing to instruct the jury that they need not be unanimous as to matters of mitigation in order to conclude that a sentence of life is more appropriate than a sentence of death. Appellant did not object at trial to the instructions given.

We need not reach the merits of appellant's contentions because even if the instructions as to mitigating evidence could be said to be deficient in some respect, appellant was not egregiously harmed in view of the fact that his mitigating evidence, youth and good behavior in prison, was not beyond the scope of the special issues and therefore did not call for a mitigating evidence instruction. *See Hughes v. State,* 897 S.W.2d 285, 301 (Tex.Crim.App.1994) (need not address complaint as to mitigating evidence charge since defendant was not entitled to mitigating evidence charge). We also note that we have addressed and rejected these same contentions in light of a similar charge. *Robertson,* 871 S.W.2d at 712. Appellant's fifteenth and sixteenth points of error are overruled.

In his eighteenth and nineteenth points of error, appellant contends the trial court fundamentally erred by failing to de-fine the terms "criminal acts of violence" and "probability" in the charge given to the jury at sentencing. Appellant concedes that we have consistently held "criminal acts of violence" and "probability" do not need to be defined in the jury instructions. *E.g. Goss v. State,* 826 S.W.2d 162 (Tex.Crim.App.1992), *cert. denied* —— U.S. ——, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993); *Penry v. State,* 691 S.W.2d 636 (Tex.Crim.App.1985), *cert. denied* 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986); *King v. State,* 553 S.W.2d 105 (Tex. Crim.App.1977), *cert. denied* 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 793 (1978). However, appellant urges us to reconsider this position in light of *Geesa v. State,* 820 S.W.2d 154 (Tex.Crim.App.1991) (holding that jury charges must define "reasonable doubt").

We denied an identical claim in *Camacho v. State.* In *Camacho,* we pointed out that *Geesa* was necessitated by change in the standard of review in cases based on circumstantial evidence. *Camacho,* 864 S.W.2d at 536. We further noted that the legislature specifies that words in statutes which are not "specifically defined" shall be "taken and understood in their usual acceptation in common language...." Tex.Code Crim.Proc. Ann. art. 3.01. Accordingly, we refused to extend *Geesa* to require the definition of "criminal acts of violence" and "probability." We see no reason to depart from our reasoning in *Camacho.* Accordingly, appellant's eighteenth and nineteenth points of error are overruled.

The judgment of the trial court is affirmed.

BAIRD, J., joins with note:

I write separately to address appellant's tenth point of error alleging ineffective assistance of counsel. In *Jackson v. State,* 877 S.W.2d 768, 772 (Tex.Cr.App.1994) (Baird and Overstreet, JJ., concurring), I noted that appellate counsel would be well advised, and appellants would be better served, if claims of ineffective assistance of counsel were *not* raised on direct appeal but rather in applications seeking habeas corpus relief. *See also, Rodriguez v. State,* 899 S.W.2d 658, 668 (Tex. Cr.App.1995). This is so because a hearing on a writ application develops a record on the conduct of counsel. With such a record, we

can better gauge the effectiveness of counsel's representation.

With these comments, I join the majority opinion.

CLINTON, J., disagreeing with the analysis, rationale, and disposition of grounds four and five, joins only the judgment of the Court.