

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-06-089-CR

ANDREW WAMSLEY                                                    APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

------------

FROM THE 297TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In twelve points, Appellant Andrew Wamsley appeals his conviction of capital murder.  We affirm.

---

[1]*See* TEX. R. APP. P. 47.4.

## II. Factual and Procedural History

On December 11, 2003, Mansfield police were dispatched to the house of Rick and Suzanna Wamsley in response to a 911 call. Upon their arrival, the police discovered Rick and Suzanna dead inside their home. After a sweep of the house, the police found no signs of forced entry. The police determined that Rick died as a result of multiple gunshot wounds and stab wounds to his head and chest, while Suzanna died as a result of a single gunshot wound to her head and multiple stab wounds to her chest.

The Wamsleys' son, Appellant, was charged with capital murder. The State's principal witness, Susana Toledano, testified that she, Appellant, and Chelsea Richardson murdered the Wamsleys on the morning of December 11. Toledano provided the State with a sample of her DNA, which matched evidence found at the murder scene. Toledano agreed to testify against Appellant in exchange for a life sentence for the lesser offense of murder. Toledano testified that Appellant murdered his parents because he wanted the money from a million dollar life insurance policy covering Rick.

Appellant pleaded not guilty; however, the jury found Appellant guilty as charged in the indictment. The State sought the death penalty, but the jury returned a "no" answer to the future dangerousness special issue. Thus, the

2

trial court imposed punishment of life imprisonment. Appellant brought this appeal.

### III. Challenge to Venire Panel

In Appellant's first point, he contends that the trial court erred by preventing a veniremember from exercising a juror exemption. In Appellant's second and third points, he asserts that he was deprived the intelligent use of his peremptory and cause challenges when the trial court refused to allow him the opportunity to question two veniremembers regarding changes in their circumstances.

### A. Applicable Facts

Voir dire began on January 12, 2006. Appellant challenged juror thirty-one, Joseph McCrary, for cause based on his views about the punishment range for the lesser included offense of murder, as well as his response to special issue two dealing with the death penalty. The trial court denied the challenge for cause. Appellant next challenged juror thirty-two, Linda Zimmerman, for cause based on her response to special issue two. The trial court denied this challenge as well.

On February 17, 2006, Appellant filed a motion for additional peremptory challenges. The motion asserted that because the trial court had denied Appellant's challenges for cause against certain veniremembers on January 12,

3

Appellant would now have to exercise peremptory strikes against them. Within the motion was a list of the veniremembers against whom Appellant intended to exercise peremptory strikes against; both Joseph McCrary and Linda Zimmerman were included.

That same day, those veniremembers who had not been excused or successfully challenged for cause on January 12 were reassembled so that the State and defense might exercise peremptory challenges. At this time, the trial court notified the parties that two jurors had contacted the bailiff to inform the court of changes in their circumstances that had occurred subsequent to their qualification and that may affect their ability to serve. Juror thirty-one, McCrary, informed the bailiff that he had recently enrolled in a college course and would like to claim a student exemption, while juror thirty-two, Zimmerman, notified the bailiff that her mother had suffered serious health complications the previous weekend and that her death was imminent.

Appellant requested the opportunity to question both veniremembers on the issues they raised to determine whether their changes in circumstances would permit the trial court to excuse them under article 35.03 of the Texas Code of Criminal Procedure, or would otherwise impact their ability to hear the case. TEX. CODE CRIM. PROC. ANN. art. 35.03 (Vernon Supp. 2007). The trial court refused Appellant's request to question the venire members and also

refused to excuse McCrary, stating that it was too late for him to claim a student exemption. Appellant objected, asserting that a juror could claim an exemption up until the time the jury is empaneled. Appellant then challenged veniremember Zimmerman for cause for a second time, and once again the trial court denied the challenge. Subsequently, Appellant's defense counsel used peremptory strikes to exclude both McCrary and Zimmerman from the jury. Appellant requested an additional peremptory challenge to be used on the next juror considered; the court granted the request as to this specific juror, but denied all of Appellant's further requests for additional peremptory challenges.

**B. Trial Court's Refusal to Excuse Juror Number 31**

In Appellant's first point, he argues that the trial court erred by preventing veniremember McCrary from exercising his student exemption.

Texas Code of Criminal Procedure article 35.03 gives a trial court broad discretion to excuse prospective jurors for good reason.[2] TEX. CODE CRIM. PROC. ANN. art. 35.03; *Crutsinger v. State,* 206 S.W.3d 607, 608 (Tex. Crim. App. 2006). Under article 35.03, "the court shall . . . hear and determine excuses

---

[2]Article 35.03 governs the hearing of juror excuses in capital murder cases. *August v. State,* No. 2-04-117-CR, 2005 WL 1477783 *5 (Tex. App.—Fort Worth June 23, 2005, pet. ref'd) (mem. op.) (not designated for publication).

offered for not serving as a juror, and if the court deems the excuse sufficient, the court shall discharge the juror or postpone the juror's service." TEX. CODE CRIM. PROC. ANN. art. 35.03. Under section 62.106(1)(a)(3) of the Texas Government Code, a person may establish an exemption from jury service if the person is enrolled and in actual attendance at an institution of higher education. TEX. GOV'T CODE ANN. § 62.106(1)(a)(3) (Vernon 2005). This is a personal, optional exemption from jury service, which may be invoked by a venireperson. *Burks v. State*, 876 S.W.2d 877, 891 (Tex. Crim. App. 1994). It does not provide for a statutory exclusion or mandatory disqualification. *Id.* A trial court retains the authority to excuse a venireperson up until the time the entire jury has been empaneled and sworn. *See Rousseau v. State*, 855 S.W.2d 666, 676-77 (Tex. Crim. App. 1993) (holding that when a veniremember who had already been questioned and qualified to serve subsequently advised the court that she wished to claim a childcare exemption, the court retained authority under article 35.03 to dismiss her from jury service).

The trial court abuses its discretion when it arbitrarily or unreasonably excuses a juror, without reference to any guiding rules and principles. *See Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990); *Gregg v. State*, 881 S.W.2d 946, 950-51 (Tex. App.—Corpus Christi 1994, pet. ref'd). Under an abuse of discretion standard, an appellate court may reverse

6

a trial court's decision only when it appears that the court applied an erroneous legal standard, or when no reasonable view of the record could support the trial court's conclusion under the correct law and the facts viewed in the light most favorable to its legal conclusion. *See DuBose v. State*, 915 S.W.2d 493, 497-98 (Tex. Crim. App. 1996). Even if the appellate court would have reached a different result, it should not intercede as long as the trial court's ruling was within the "zone of reasonable disagreement." *Montgomery*, 810 S.W.2d at 391.

Appellant contends that the trial court erred by denying McCrary of his absolute right to exercise his student exemption. We disagree. Although an exemption is both personal and optional as to the venireperson, the juror has no absolute right to the exemption as it is neither a statutory exclusion nor a mandatory disqualification. *Burks*, 876 S.W.2d at 891. Although the trial court could have excused McCrary, it was not required to do so.[3] Thus, Appellant's assertion that McCrary had an absolute right to claim his exemption is simply unfounded.

---

[3]The trial court believed that it was too late for McCrary to claim his exemption; however, this belief was incorrect because under article 35.03, the trial court retains the authority to excuse a venireperson up until the time the entire jury has been empaneled and sworn. *See Rousseau*, 855 S.W.2d at 676-77.

Furthermore, excuses are considered on a case-by-case basis and are within the broad discretion of the court. *Jasper v. State*, 61 S.W.3d 413, 424 (Tex. Crim. App. 2001). Here, the record shows that McCrary was not a student at the time of individual voir dire, but only later chose to enroll in college courses. By this point, McCrary had already been questioned at length and had been qualified to sit on the jury of a capital murder case. Nothing in the record indicated that McCrary was unfit to serve for any purpose. Based on the preceding facts and the trial court's interest in assuring that a sufficient panel existed from which to choose a jury, it was well within the trial court's discretion to reject McCrary's request to be excused from further proceedings. Therefore, we conclude that the trial court did not abuse its discretion in refusing to allow McCrary to claim a student exemption. *See Montgomery*, 810 S.W.3d at 380. Accordingly, we overrule Appellant's first point.

**C. Alleged Denial of Intelligent Use of Peremptory Strikes and Challenges for Cause**

In Appellant's second and third points, he contends that because the trial court erroneously denied his request to question veniremembers McCrary and Zimmerman about changes in their circumstances that occurred after they had been qualified to serve, he was unable to intelligently exercise his peremptory strikes and challenges for cause.

1. Applicable Law

The Sixth Amendment guarantees the assistance of counsel and the right to a trial before an impartial jury. *Franklin v. State,* 138 S.W.3d 351, 354 (Tex. Crim. App. 2004). Part of the constitutional guarantee of the right to an impartial jury includes adequate voir dire to question veniremembers in order to identify unqualified jurors and intelligently exercise peremptory challenges and challenges for cause. *See id.* When a defendant is prevented from questioning the venire, he is prevented from obtaining information, which implicates constitutional protections. *Id.* at 356.

2. Analysis

Here, the trial court refused Appellant's request to question veniremembers McCrary and Zimmerman on whether the changes in their circumstances would warrant dismissal under article 35.03 or would otherwise impact their ability to hear the case. *See* Tex. Code Crim. Proc. Ann. art. 35.03.

After reviewing the record, we conclude that if the trial court had permitted additional questioning of McCrary and Zimmerman regarding their changed circumstances, the questioning could have yielded information that could have led to the exercise of a challenge for cause. Although there is no "personal business" reason set out as grounds for a challenge for cause in the

9

statute, the court of criminal appeals has held that a challenge for cause may be asserted based on a juror's inability to give fair consideration to the case due to personal concerns. *See* TEX. CODE CRIM. PROC. ANN. art. 35.16(a), (b), or (c) (Vernon Supp. 2007); *Burks,* 876 S.W.2d at 896. Thus, Appellant should have been permitted to further question McCrary and Zimmerman regarding their changed circumstances because additional questioning may have revealed whether they would have been unable to give fair consideration to the case. *See Burks*, 876 S.W.2d at 896.

### 3. Harm Analysis

The harm analysis traditionally applied to the erroneous denial of a defendant's challenge for cause also applies to the erroneous prohibition of proper questioning of individual prospective jurors. *Anson v. State,* 959 S.W.2d 203, 204 (Tex. Crim. App. 1997), *cert. dismissed*, 525 U.S. 924 (1998). When a trial court erroneously prohibits a defendant from properly questioning individual prospective jurors, the defendant suffers harm if he has been forced to use a peremptory challenge he would not have otherwise used but for the trial court's error. *Id.* A reviewing court may determine that the defendant was harmed only if the defendant (1) exhausts all of his peremptory challenges, (2) he requests more challenges, (3) his request is denied, and (4) he identifies an objectionable person seated on the jury on whom he would

have exercised a peremptory challenge. *Id.* (citing *Janecka v. State*, 937 S.W.2d 456, 470-71 & n. 9 (Tex. Crim. App. 1996) (per curiam)). Essentially, a defendant is harmed only if he was forced, in effect, to blindly exercise a peremptory challenge as to a single veniremember to prevent him from sitting on the jury, and this preventative use of the peremptory challenge subsequently results in the deprivation of a peremptory challenge he would have used later on. *See Janecka*, 937 S.W.2d at 470.

Although we have determined that the trial court erroneously prohibited Appellant from asking proper questions of certain individual prospective jurors, Appellant's claim that he was unable to intelligently exercise his challenges for cause and peremptory strikes must nevertheless fail because Appellant was not forced to exercise peremptory challenges on McCrary and Zimmerman due to the trial court's error. After jury selection was completed, Appellant made a bill of exception in which McCrary testified that if he were required to serve on the jury, his professors were willing to work with him regarding his absence. Zimmerman also testified and stated that if she had been forced to serve as a juror "it would have been tough" considering her mother's death was imminent, but that she would have been able to give Appellant a fair trial. The testimony developed by Appellant in the bill of exception indicates that neither McCrary nor Zimmerman's personal concerns would have prevented or impaired their

11

performance of their duties as jurors, or would have kept them from being fair and impartial jurors. Thus, Appellant was not harmed by the trial court's refusal to allow additional questioning because Appellant's own bill of exception shows that such questioning would not have revealed grounds for a challenge of cause.

Furthermore, Appellant cannot plausibly claim that had the trial court allowed him to question McCrary and Zimmerman regarding their changed circumstances he still would not have exercised his peremptory strikes on them. The record shows that after Appellant's initial challenges for cause of McCrary and Zimmerman were denied, Appellant filed a motion for additional peremptory challenges in which he specifically named McCrary and Zimmerman as two persons he wished to exercise his peremptory strike on based on answers they had given during individual voir dire.[4] Appellant filed this motion before any peremptory strikes were used and prior to learning that McCrary and

---

[4]Appellant initially attempted to challenge juror McCrary for cause due to McCrary's inability to consider the entire range of punishment on the lesser offense of murder, and because McCrary believed that by finding Appellant guilty as a party to the offense of capital murder he would have already answered special issue two in the affirmative. Similarly, at the conclusion of individual voir dire of juror Zimmerman, Appellant challenged her for cause because she believed that by finding Appellant guilty as a party to the offense of capital murder she would have already answered special issue two in the affirmative. The trial court denied both challenges.

12

Zimmerman had notified the trial court of their changed circumstances. Based on these facts, we are not convinced that Appellant was forced to "blindly" exercise his peremptory challenges on McCrary and Zimmerman because the trial court denied him the opportunity to ask them additional questions or denied his challenges for cause. *See Janecka*, 937 S.W.2d at 470. The record demonstrates that Appellant already intended to strike these two individuals based on their individual voir dire answers; thus, his contention that he would have used the peremptory challenges he wasted on McCrary and Zimmerman on other, less favorable jurors is simply not believable. *See id.* Accordingly, we hold that the trial court's error in denying additional questioning did not contribute to Appellant's conviction or punishment, and so we overrule Appellant's second and third points.

## IV. Motion to Quash

In Appellant's twelfth point he argues that the trial court erred in denying his motion to quash the jury panel due to noncompliance with proper jury selection procedures when, without a presiding judge and outside of his presence, the prospective jurors submitted juror cards and were granted purported disqualifications and excuses.

**A. Applicable Law**

Texas Code of Criminal Procedure article 35.03, section 2 provides that under a plan approved by the commissioner's court of the county, "in a case other than a capital felony case, the court's designee may hear and determine an excuse" and postpone a juror's service.[5] TEX. CODE CRIM. PROC. ANN. art. 35.03, § 2; *Chambers v. State*, 903 S.W.2d 21, 29 (Tex. Crim. App. 1995). The court of criminal appeals has previously held that when article 35.03 section 2 is viewed in the context of the jury formation process, the language does not prohibit the general assembly judge from designating personnel to make such decisions. *Chambers*, 903 S.W.2d at 30. This is because at the time the summoned jurors apply for excuses, they have not been assigned to any particular case. *Id.* There is no way of knowing what kind of case the prospective jurors would subsequently be assigned to, capital or noncapital. *Id.* Thus, article 35.03(2) should be construed as referring only to the distinction

---

[5]Generally, when prospective jurors are initially summoned, they are assembled in a general jury pool or general assembly. *Jasper,* 61 S.W.3d at 422-23. Members of the general assembly are qualified on their ability to serve, and exemptions and excuses are heard and ruled on by the judge presiding over the general assembly. TEX. GOV'T CODE ANN. § 62.016 (Vernon 2005); *Jasper*, 61 S.W.3d at 423. Prospective jurors who are not disqualified, exempt, or excused are divided into trial panels and sent to the individual courts trying the cases. *Jasper,* 61 S.W.3d at 423. At that point, attorney voir dire will result in the jury that will ultimately hear the case. *Id.*

14

between a special venire and the formation of panels through a general assembly. *Id.* In the case of a special venire called in a capital case, the trial judge cannot designate others to make decisions with respect to excuses. *Id.*

**B. Analysis**

Paula Morales, a jury bailiff for Tarrant County, testified that on January 12, 2006 prospective jurors were assembled in a general jury pool. Morales and her staff heard requests for exemption and disqualifications, and they subsequently excused a number of individuals before a jury panel was assigned to Appellant's case. From the remaining pool, one hundred and fifty individuals were sent to comprise the jury panel for this case.

Appellant argues that because he was charged with a capital crime, article 35.03(2) requires that the trial court, rather than Morales and her staff, hear excuses and determine disqualifications. However, we conclude otherwise. Here, the potential jurors that were granted excuses by court designees were general assembly veniremembers who were not assigned to Appellant's case or any other particular case. Nor had a special venire been

15

granted.[6]  Therefore, under the existing interpretation of article 35.03(2), the fact that this is a capital murder case does not prohibit the general assembly judge from designating personnel to make such decisions.  *Chambers*, 903 S.W.2d at 30.

Appellant further contends that because the veniremember's excuses and disqualifications were not handled in either his or his attorney's presence, the panel should have been quashed.  Again, we hold otherwise.  Texas Code of Criminal Procedure article 33.03 provides in relevant part that "[i]n all prosecutions for felonies, the defendant must be personally present at the trial[;]" however, the general assembly is not considered part of Appellant's trial because particular jurors who were summoned had not been assigned to a particular case.  *See Chambers*, 903 S.W.2d at 31.  For this reason, neither Appellant nor his counsel were entitled to be present; therefore, the trial court did not err in refusing to quash the panel.  *See id.*  Accordingly, we overrule Appellant's twelfth point.

---

[6]Because more than one hundred jurors were called for service the week of Appellant's trial, the decision to grant a special venire was within the discretion of the trial court.  *See* TEX. CODE CRIM. PROC. ANN. art. 34.01 (Vernon Supp. 2007); *Barnes v. State*, 876 S.W.2d 316, 324 (Tex. Crim. App. 1994).

16

In Appellant's seventh point he contends that the trial court violated the federal equal protection clause by overruling his *Batson v. Kentucky* objection to the State's venire panel shuffle request.

## A. Applicable Law

Article 35.11 of the Texas Code of Criminal Procedure provides the defendant with a right to a shuffle of the jury panel. *See* TEX. CODE CRIM. PROC. ANN. art. 35.11 (Vernon Supp. 2007); *Ex parte Daigle*, 848 S.W.2d 691, 692 (Tex. Crim. App. 1993). A request is timely if made prior to commencement of voir dire. *Latham v. State*, 656 S.W.2d 478, 479 (Tex. Crim. App. 1983).

In *Batson v. Kentucky*, the Supreme Court held that racial discrimination in the use of peremptory challenges denies a defendant the equal protection of the law guaranteed by the U.S. Constitution. *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986). But the Court of Criminal Appeals has never held that *Batson* applies to jury shuffles. *See Ladd v. State*, 3 S.W.3d 547, 563 n.9 (Tex. Crim. App. 1999) (stating in a footnote that it does not endorse the view that *Batson* extends to jury shuffles), *cert. denied,* 529 U.S. 1070 (2000).

## B. Analysis

In the case before us, the State requested a shuffle of the panel after the venire was assembled. Appellant objected to the shuffle on the basis of *Batson*

17

*v. Kentucky*, arguing that the motive for the shuffle was not race-neutral due to the disproportionate number of minorities in the first seventy-five panel members. The trial court overruled the objection.

Despite Appellant's attempt to persuade this court that *Batson* is applicable to jury shuffles, we have not found, nor has Appellant shown us, any case law that directly applies *Batson* to a jury shuffle. In contrast, the court of criminal appeals averred in *Ladd*, albiet in dicta, that it does not endorse the view that *Batson* applies to jury shuffles. *See id.*; *see also Ashorn v. State,* 77 S.W.3d 405, 408 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (stating that the court of criminal appeals has declared that its footnotes are dicta). Appellant attempts to support his position by directing us to *Miller-El v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317 (2005), in which the United States Supreme Court held that the prosecutor's jury shuffle request was a clue indicating his intent to use his peremptory challenges in a discriminatory fashion. Although this case demonstrates that the prosecution's use of a jury shuffle may be examined in determining whether broader patterns of discriminatory practice are used during jury selection, the court did not definitively hold that a *Batson* challenge extends beyond peremptory challenges and into the realm of jury shuffles. *Id.* Therefore, we will not make such a determination either. Because

18

Appellant asserts a position that is not supported by precedent, we overrule his seventh point.

## VI. Admissibility of Witness's Inconsistent Statements

In Appellant's fourth, fifth, and sixth points he contends that the trial court violated the Confrontation Clause and Texas Rules of Evidence 613(b) by excluding prior inconsistent statements made by Sarah Wamsley, Rick and Suzanna's daughter, that would have impeached her testimony and corrected the false impressions she created on direct examination.

### A. Applicable Law

A trial court's evidentiary rulings are reviewed under an abuse of discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). The reviewing court should not reverse the trial court if its ruling was within the zone of reasonable disagreement. *Montgomery*, 810 S.W.2d at 391.

The constitutional right of confrontation provides that the accused shall enjoy the right . . . to be confronted with the witnesses against him. U.S. CONST. amend. VI. A primary interest secured by the Confrontation Clause is the right of cross-examination. *Lopez v. State,* 18 S.W.3d 220, 222 (Tex. Crim. App. 2000). It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on

19

defense counsel's inquiry into the potential bias of a prosecution witness. *Delamora v. State,* 128 S.W.3d 344, 364 (Tex. App.—Austin 2004, pet. ref'd). On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant. *Lopez,* 18 S.W.3d at 222. The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish*. Delamora,* 128 S.W.3d at 364.

In general, witnesses may not be impeached regarding collateral matters. *Ramirez v. State*, 802 S.W.2d 674, 676 (Tex. Crim. App. 1990). A collateral matter is one which seeks only to test a witness's general credibility or relates to facts irrelevant to issues at trial. *Keller v. State*, 662 S.W.2d 362, 365 (Tex. Crim. App. 1984); *Cortez v. State*, No. 2-05-147-CR, 2006 WL 1563275, at *11 (Tex. App.—Fort Worth June 8, 2006, pet. ref'd) (mem. op.) (not designated for publication). The test as to whether a matter is collateral is whether the cross-examining party would be entitled to prove it as a part of his case tending to establish his plea. *Bates v. State*, 587 S.W.2d 121, 133 (Tex. Crim. App. 1979). When a witness leaves a false impression concerning a

20

matter relating to his or her credibility, the opposing party is allowed to correct that false impression. *Ramirez*, 802 S.W.2d at 676. However, this exception does not apply when the false impression is created by cross-examination. *See Shipman v. State*, 604 S.W.2d 182, 183-84 (Tex. Crim. App. 1980).

**B. Applicable Facts**

On direct examination, Sarah testified that her adolescence was difficult for both herself and her parents because she was a "wild child." She received both medication and therapy for her psychological problems, but stated that she did not did not work through all of her issues until about a year after she left Todd Cleveland, the father of her child. She claimed that her parents were supportive throughout this time.

On cross-examination, Sarah testified that while she and her parents had arguments, they were still supportive of her. Appellant also asked Sarah whether her mother had ever talked to her about getting a divorce; Sarah stated that while her parents had their difficulties, they had not discussed any plans for divorce with her. Upon Appellant's inquiry, Sarah testified that she had voluntarily admitted herself into Millwood Hospital because of the troubles she was having with the father of her child.

During cross-examination of Sarah, Appellant sought to introduce prior inconsistent statements to impeach Sarah's testimony; however, the trial court

sustained the State's objections on relevance grounds. Appellant asserted that the evidence was relevant because Sarah's testimony created the false impressions that her parents were "always" supportive of her, that the sole reason she entered therapy was because of the ongoing problems she had with the father of her child, and that she did not know of any plans her parents may have had for divorce. The trial court permitted Appellant to ask Sarah questions outside the jury's presence as an offer of proof under Texas Rule of Evidence 103.[7]

## C. Analysis

After reviewing the record, we determine that the trial court properly limited Appellant's cross-examination of Sarah to relevant matters. The issues that Appellant sought to cross-examine Sarah on were collateral, and therefore the general rule that a witness may not be impeached regarding collateral matters applies. *See Ramirez,* 802 S.W.2d at 676. Whether the Wamsleys were supportive of Sarah, whether Sarah knew of any plans her parents may have had to divorce, and the reason Sarah entered therapy was not evidence

---

[7]In Appellant's offer of proof, Appellant questioned Sarah regarding statements she made to her therapist while undergoing psychological treatment at Millwood Hospital. Each of the questions addressed the difficulties that Sarah had with her parents, how they made her feel, as well as the problems that Rick and Suzanna had with one another. Sarah either denied or did not recall making any of the statements Appellant questioned her on.

22

that Appellant could have relied on in his case-in-chief to show that he had not committed the murders of his parents. *See id.*

Appellant attempts to show that even if these issues were collateral, the trial court should have permitted him to cross-examine Sarah because her testimony created false impressions regarding her credibility that needed to be corrected. He relies on the exception that if a witness leaves a false impression concerning a matter relating to his or her credibility, then the opposing party is allowed to correct that false impression. *See id.* Specifically, Appellant argues that Sarah's testimony created the false impression that (1) the Wamsleys were always supportive of her, (2) that she did not know of her parent's plans for divorce, and (3) that all of Sarah's problems were related to a bad relationship with Todd Cleveland. He contends that he should have been permitted to cross-examine Sarah with statements she made while in therapy that would have corrected these false impressions.

We first evaluate Appellant's argument that Sarah's testimony created the false impression that her parents were always supportive of her. The issue of her parent's support arose when the prosecutor asked Sarah whether her parents had been supportive of her while she underwent therapy for psychological problems. When asked whether her parents had been supportive

23

during this time Sarah answered "yes"; in response to the question of whether they had continued to be supportive of her, Sarah answered, "always."

After examining cases in which the false impression exception applied, we determine that the exception is not applicable here. The testimony before us today differs greatly from situations in which the "false impression" exception is typically applied. For instance, in *Ex parte Carter*, 621 S.W.2d 786, 788 (Tex. Crim. App. 1981), the appellant's direct testimony conveyed the distinct impression that his two prior convictions and two prior arrests constituted his entire "record," including convictions and arrests. The tenor of appellant's direct testimony was that, except for those four instances, his "record" was clean. In contrast, the appellant had been arrested and booked over thirteen times. The court held that it was permissible to impeach the appellant with evidence of these additional arrests because the appellant had given a false impression of his record. *Carter*, 621 S.W.2d at 788. In that case, the only way that the jury was going to learn that the appellant's testimony was incorrect was if the court allowed the State to impeach the appellant. In contrast, our review of the record shows that although Sarah stated on direct that her parents were always supportive of her, this testimony was balanced by her testimony on cross-examination in which she stated that even though she and her parents had arguments, her parents still supported her.

24

Based on the combination of her testimony on direct and cross-examination, the jury was provided with an impression that while Sarah's relationship with her parents was not without disapproval and trouble at different times, overall, Sarah's parents supported her. Thus, we conclude that the jury was not left with a false impression of Sarah's relationship with her parents that needed to be corrected by additional cross-examination.

In regard to the second and third statements, we determine that even if Sarah's testimony created the false impressions that she did not know of her parent's plans for divorce and that all of her problems were related to a bad relationship with Todd Cleveland, the trial court properly denied cross-examination on these issues. Our review of the record shows that neither of these "false impressions" were created by Sarah's testimony on direct examination; in contrast, it was Appellant who raised them during cross-examination. It was Appellant who asked Sarah if the only reason she voluntarily admitted herself into treatment was because of her problems with her child's father. Similarly, it was Appellant who raised the issue of whether Sarah knew of any plans her parents may have had to divorce. Because a party may not rely on its own questioning on cross-examination to contradict a witness and get into evidence collateral matters which would otherwise be inadmissible, we determine that the trial court did not abuse its discretion in

25

prohibiting Appellant from impeaching Sarah on these collateral issues.  *See Shipman*, 604 S.W.2d at 185.

Furthermore, even if the trial court had permitted Appellant to cross-examine Sarah on any of these issues, it would not have revealed bias or motivation to testify falsely on Sarah's behalf.  Appellant desired to cross-examine Sarah with prior inconsistent statements to impeach her credibility.  Specifically, he claimed that the inconsistency of her statements would demonstrate that Sarah had a motive to testify falsely because she was a named beneficiary in her parent's will, and that her inheritance would be greater if she was the sole beneficiary.  However, even without cross-examination on the statements Sarah made in therapy, Appellant had already been allowed to establish that Sarah had gained financially from her parent's death as she was a named beneficiary of her parent's estate.  Any possible bias or motive Sarah would have to testify falsely had already been clearly presented to the jury.  Therefore, Appellant had already been afforded the opportunity for a thorough and effective cross-examination, and any additional cross-examination was unnecessary.  *See Lopez*, 18 S.W.3d at 222.

In conclusion, we hold that the trial court did not abuse its discretion in limiting Appellant's cross-examination of Sarah when he had been afforded the

opportunity for effective cross-examination. *See id.* Accordingly, we overrule Appellant's fourth, fifth, and sixth points.

### VII. Motion to Suppress—Timing of Execution of Search Warrant

In Appellant's eighth point he argues that the trial court erred by failing to suppress blood and DNA evidence because the repeated search of his vehicle went beyond the temporal scope and authority of the warrant and was therefore unlawful. In Appellant's eleventh point he contends that the warrantless seizure of his automobile was a violation of the Fourth Amendment.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total

27

deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108-09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652-53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818-19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id*. at 819. We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the

28

trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

## B. Applicable Law

The Fourth Amendment protects against unreasonable searches and seizures. U.S. CONST. amend. IV. Generally, a search conducted without a warrant is considered per se unreasonable. *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003). But there is an exception for vehicles—a warrantless search of a vehicle is reasonable if law enforcement officials have probable cause to believe that the vehicle contains evidence of a crime. *Chambers v. Maroney*, 399 U.S. 42, 48-49, 90 S. Ct. 1975, 1980-81 (1970); *Wiede v. State,* 214 S.W.3d 17, 24 (Tex. Crim. App. 2007); *Amos v. State*, 819 S.W.2d 156, 160-61 (Tex. Crim. App. 1991). Less rigorous warrant requirements govern vehicles because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office. *Wiede,* 214 S.W.3d at 24.

There is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure. *U.S. v. Johns,* 469 U.S. 478, 484, 105 S. Ct. 881, 885 (1985). Once probable cause to believe that a car contains evidence of a crime is established, the officers can conduct a valid

29

search of the car immediately, without a warrant. *Amos*, 819 S.W.2d at 161. There is no requirement of exigent circumstances to justify a warrantless search of a vehicle. *Johns*, 469 U.S. at 484, 105 S. Ct. at 885*; State v. Guzman*, 959 S.W.2d 631, 634 (Tex. Crim. App. 1998).

Probable cause exists when, under the totality of the circumstances, there is a "fair probability" that contraband or evidence of a crime will be found in the specified location. *Rodriguez v. State*, 232 S.W.3d 55, 60 (Tex. Crim. App. 2007). When the facts and circumstances within the knowledge of the officer on the scene and of which he has reasonably trustworthy information would lead a man of reasonable caution and prudence to believe that he will find the instrumentality of a crime or evidence pertaining to a crime, probable cause exists. *Barber v. State,* 611 S.W.2d 67, 68 (Tex. Crim. App. 1981). The sum of the information known to the cooperating officers at the time of a search is to be considered in determining whether there was sufficient probable cause. *Woodward v. State*, 668 S.W.2d 337, 344 (Tex. Crim. App. 1982).

**C. Analysis**

Appellant contends that the warrantless seizure of his vehicle and its subsequent search violated the Fourth Amendment. Specifically, he argues that the searches conducted on December 17 and 18, 2003, and February 5, 2004, were illegal because the police conducted the searches under the authority of

30

a warrant that was no longer valid under articles 18.06(a) and 18.07 of the Texas Code of Criminal Procedure.[8]

## 1. Seizure and Search of Appellant's Car

On December 12, 2003, Appellant signed a consent to search his vehicle, a 1998 Ford Mustang. Officer Mark Kelly searched the vehicle pursuant to consent and recovered a latex glove from the backseat floorboard. Appellant then withdrew his consent. Mansfield police secured the vehicle and held it in their impound lot until they could obtain a search warrant. Police obtained a warrant by 7:00 p.m. on that day. The next day, December 13, Tom Ekis of Forensic Consultants conducted Luminol testing on the interior of the vehicle, and various cuttings were taken from the vehicle. On December 17, Officer Mark Kelly conducted additional Luminol testing on the Mustang's interior and recommended that certain pieces be removed from the vehicle. The following day, December 18, police removed cuttings from the front passenger headrest cover, the front passenger seat's back cover, the trunk fabric cover, and the back seat's cover on the passenger side. On February 5, 2004, the police

---

[8]Articles 18.06(a) and 18.07 provide that a search warrant must be executed within three days from the time of its issuance. *See* TEX. CODE CRIM. PROC. ANN. art. 18.06(a), 18.07 (Vernon Supp. 2007). Any evidence recovered pursuant to an entry into a vehicle after the three-day period has been illegally obtained and therefore should be excluded. *Green v. State*, 799 S.W.2d 756, 759 (Tex. Crim. App. 1990).

31

removed additional items from the Mustang, including the back side of the front passenger seat, the foam seat bottom from the front passenger seat, the carpet below the front passenger seat, and a piece of cotton that was lying under the front passenger seat.

## 2. Appellant's Motion to Suppress and the Trial Court's Findings of Facts

At a pretrial hearing on his motion to suppress, Appellant argued that the police searched the vehicle repeatedly after the temporal scope and authority of the warrant had expired when they entered his vehicle on December 17 and 18, 2003, and February 5, 2004. The trial court overruled Appellant's motion to suppress and entered findings of fact.

The trial court found that Detective Ralph Standefer was the lead detective in the investigation of the Wamsleys' murders. He was on the scene on December 12, 2003, when Appellant arrived. The court found that upon the detective's request, Appellant voluntarily followed him back to the Mansfield Police Department to talk, where he voluntarily signed a form giving consent to search his vehicle. While searching Appellant's car, they found a white latex glove as well as several receipts; Appellant immediately withdrew his consent to search. The trial court found that Detective Standefer kept Appellant's vehicle after he withdrew his consent to search, and that

at the time the vehicle in question was secured at the Mansfield Police Department to await the signing of a search warrant that [Appellant] had become a suspect, that the vehicle was registered to the victims of the offense, Rick Wamsley and Suzanna Wamsley, that the vehicle had been missing from the scene of the offense and that it was then believed that since it was missing from the victims' residence that the actor(s) may have driven the vehicle from the residence after the offense and may contain blood evidence.

The trial court also found under the circumstances it was reasonable to secure the vehicle to await the signing of a search warrant. It further found that the facts recited in the affidavit gave the affiant probable cause for his beliefs that the vehicle contained evidence, and were sufficient for the magistrate to find that the affiant had probable cause to issue the warrant. The warrant was issued on December 12, 2003, and when it was executed on December 13, the presence of blood was detected by Luminol testing. The court further found that the subsequent entries of the car on December 17 and 18, 2003 and February 5, 2004 were not new searches of the vehicle, but entries made for the purpose of removing and testing what had already been detected and seized by the police on December 13, 2003.

3. Harm Analysis

Assuming without deciding that the trial court erred in overruling Appellant's motion to suppress the evidence seized from Appellant's vehicle, we determine that any error was harmless.

33

The harm analysis for the erroneous admission of evidence obtained in violation of the Fourth Amendment must be conducted under Rule 44.2(a)'s constitutional standard. TEX. R. APP. P. 44.2(a); *Hernandez v. State,* 60 S.W.3d 106, 108 (Tex. Crim. App. 2001). The question is whether the trial court's denial of Appellant's motion to suppress and admission of the evidence was harmless beyond a reasonable doubt. *See Williams v. State*, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997). In applying the "harmless error" test, our primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998), *cert. denied*, 526 U.S. 1070 (1999).

Our harmless error analysis should not focus on the propriety of the outcome of the trial; instead, we should calculate as much as possible the probable impact on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001). We consider the source and nature of the error, the extent that it was emphasized by the State, its probable collateral implications, the weight a juror would probably place on the error, and whether declaring it harmless would be likely to encourage the State to repeat it with impunity. *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989). This requires

34

us to evaluate the entire record in a neutral, impartial, and even-handed manner, not "in the light most favorable to the prosecution." *Id.* at 586.

A review of the record shows that Carolyn Van Winkle, who is employed by the DNA section of the Tarrant County Medical Examiner's crime laboratory, testified at trial that she examined cuttings of upholstery and carpet taken from Appellant's Mustang and identified some faint, diffuse stains. Some of the stains tested positive with a blood reagent, and she was able to identify those stains as human blood. Van Winkle also testified that she was able to get a partial DNA profile of Chelsea Richardson from a couple of bloodstains on the upholstery sample, and was unable to exclude Chelsea as the source of DNA recovered from the back seat cover. On cross-examination, Van Winkle agreed with Appellant's attorney that no sample taken from the Mustang was consistent with Rick's or Suzanna's DNA profile.

In evaluating whether the admission of the evidence harmed Appellant, we consider the fact that Appellant's DNA did not appear in any of the seized evidence, nor were any of the samples recovered from the Mustang consistent

35

with Rick's or Suzanna's DNA profile.[9]  In fact, the inadequacy of the DNA

evidence was actually pointed out by Appellant's counsel during both opening

statements and closing arguments when his counsel told the jury that the State

would not be able to link Appellant to the murders through DNA evidence.

Appellant's counsel specifically stated during opening statements that the

search of the car did not result in "evidence of any kind, of any type of blood

evidence or DNA evidence to tie [Appellant] to the deaths of Rick and Suzy

Wamsley."  Appellant's counsel again emphasized the lack of DNA evidence to

the jury during closing arguments when he stated the following:

> [W]hat the DNA tells you in this case isn't much, and it doesn't fill
> the gaps in the evidence . . . It doesn't tell you that [Appellant] had
> anything to do with the physical evidence or what occurred with
> Mr. and Mrs. Wamsley, and it doesn't put any of their blood
> standards or their samples out in the car, out of his car . . . .

Furthermore, the State's emphasis on the blood and DNA evidence

recovered from the search of the Mustang was slight.  During closing

arguments, the State mentioned that the swabs and cuttings from the Mustang

---

[9]In his attempt to show harm, Appellant points out that Van Winkle testified that she detected a mixed DNA profile on the outside of the glove recovered from the Mustang, and that she could not exclude either Chelsea or Appellant as being contributors to the mixture.  We have not considered this in our harm analysis simply because the glove was recovered in the initial search that was conducted pursuant to Appellant's consent.  Therefore, we will not factor it into our analysis.

were positive for blood, and stated "[t]hat's an awful lot of areas in an automobile for there to be positive traces of blood in a car."

Moreover, the strength of the State's case linking Appellant to the murders was not based on the DNA and blood evidence derived from the car. Rather, the State's case hinged on the testimony of Susan Toledano, an accomplice in the Wamsleys' murders. Toledano testified that she, Chelsea, and Appellant murdered Rick and Suzanna during the early morning hours of December 11, 2003. In her testimony, she related how the plans to harm the Wamsleys developed. Sometime during October 2003, Toledano, Chelsea, and Appellant began their initial discussions of how they could injure the Rick and Suzanna. Their ideas included tampering with the brakes in Rick's car and putting balloons filled with Drano into the gas tanks of their cars. At some point during the development of their plans, Hilario Cardenas, a friend of Chelsea and Appellant, provided them with a revolver. In the latter part of the fall, Appellant contacted Ruth Brustrom, a friend of Chelsea's family, and asked her if he, Chelsea, and Toledano could practice shooting on her property in Burleson.[10] Each of the three took turns shooting the gun into a pond on Brustrom's property. Soon after, they came up with another plan to harm the

---

[10]Toledano testified that they went to Brustrom's property to practice shooting and to determine who had the best shot.

Wamsleys. In November 2003, Toledano and Appellant attempted to kill the Wamsleys by shooting the gas tank of the Jeep they were riding in, in hopes that the car would blow up. Eventually, their plan to harm the Wamsleys was effectuated when they shot and stabbed the Wamsleys during the early morning hours on December 11. Toledano testified that immediately after the murders Chelsea used Toledano's cell phone to call her friend Jeremy.

Toledano's entire testimony was corroborated by several other witnesses who testified at trial. Brustrom, a longtime friend of Chelsea's family, testified that during the fall of 2003 Appellant had called her asking if he and Toledano could visit her property in Burleson because Toledano wanted to learn how to shoot a gun. Sometime after Halloween, but before the Wamsleys were murdered, Appellant, Toledano, and Chelsea went to her property in Burleson. Brustrom testified that after Appellant retrieved a gun from the trunk of the car, he loaded it and they all went down to the pond and took turns firing the gun.

Sarah Wamsley testified that on November 9, 2003, she and her parents were returning from Joshua, Texas, where they had gone to ride their horses. While driving along I-35, she heard a boom and thought that a rock had struck their Jeep. Police responded to Suzanna's 911 call and discovered a hole in the left rear panel of the Jeep. The police recovered a bullet from the Jeep.

38

Keith Cowand, a neighbor of the Wamsleys, testified that on the night of December 11, 2003 he was awakened by something that sounded like gunshots. He stated that he looked at his clock and it was 3:23 a.m. Jeremy Lavender also testified that during the early morning hours of December 11 he received a series of phone calls from Chelsea to his cell phone and land line. Chelsea wanted him to be her alibi, but would not tell him what kind of trouble she was in or why she needed an alibi when he asked.[11] The State submitted into evidence Jeremy's telephone records, which showed that on December 11 Jeremy received six phone calls from Chelsea between 3:42 a.m. and 4:02 a.m.

The jury also heard the testimony of Ron Van Fleet, a firearms and toolmark examiner for the Fort Worth Police Department Crime Laboratory, who testified that he compared a single bullet removed from Brustrom's pond with bullets recovered from the Wamsleys' dining room, the headboard in their master bedroom, the soffit area outside the master bedroom, Suzanna's body,

---

[11]Jeremy testified that Chelsea had told him to "tell the police that [Toledano, Appellant, and herself] came to your house and all that. We wanted you to go to Putt-Putt, but you couldn't come, so we came over to your house and we stayed for a little while and then we left and I talked to you on the phone."

39

and Rick's Jeep.[12]  After comparing all of the bullets, Van Fleet testified that all of the bullets were fired from the same weapon.

It is clear from the record that Appellant's conviction for his parent's murders was based on the cumulative testimony of these witnesses and not on evidence recovered from the search of his car.  Therefore, in light of all the other evidence presented at trial connecting Appellant to the murders, in addition to the State's lack of emphasis on the evidence and Appellant's ability to discredit it at trial, we hold that the trial court's admission of the blood and DNA evidence recovered from the search of his Mustang was harmless beyond a reasonable doubt because it did not contribute to Appellant's conviction or punishment.  *See* TEX. R. APP. P. 44.2(b); *see Wesbrook,* 29 S.W.3d at 119. Accordingly, we overrule Appellant's eighth and eleventh points.

### VIII. Motion to Suppress—Probable Cause

In Appellant's ninth point he argues that he was subjected to an unlawful search and seizure of his vehicle because the search warrant was not supported by probable cause.  In his tenth point, he asserts that the affidavit supporting the search warrant for his vehicle failed to establish probable cause and thus

---

[12]After Rick and Suzanna were murdered, Brustrom gave the police consent to search and drain the pond.  One bullet was recovered from the pond during the search.

the search violated the Fourth Amendment because the affiant omitted material information with reckless disregard for the truth.

## A. Applicable Law

A search warrant may not be issued unless supported by a sworn affidavit that sets forth sufficient facts to establish probable cause: (1) that a specific offense has been committed, (2) that the specifically described property or items that are to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense, and (3) that the property or items constituting evidence to be searched for or seized are located at or on the particular person, place, or thing to be searched. *See* TEX. CODE CRIM. PROC. ANN. art. 18.01(c).

The cornerstone of the Fourth Amendment is that a magistrate shall not issue a search warrant without first finding "probable cause" that a particular item will be found in a particular location. *Rodriguez,* 232 S.W.3d at 60. When reviewing a magistrate's decision to issue a warrant, trial and appellate courts apply a highly deferential standard in keeping with the constitutional preference for a warrant*. Id.* Thus, when an appellate court reviews the sufficiency of an affidavit for a search warrant, the reviewing court is limited to the four corners of the affidavit. *Hankins v. State*, 132 S.W.3d 380, 388 (Tex. Crim. App.),

41

*cert. denied*, 543 U.S. 944 (2004); *Jones v. State*, 833 S.W.2d 118, 123 (Tex. Crim. App. 1992), *cert. denied*, 507 U.S. 921 (1993).

Furthermore, as reviewing courts, we are obliged to defer to the magistrate and uphold his determination based upon all reasonable and commonsense inferences and conclusions that the affidavit facts support. *Rodriguez*, 232 S.W.3d at 64. We must defer to the magistrate's finding of probable cause if the affidavit demonstrates a substantial basis for his conclusion. *Id.* It is not necessary to delve into all of the facts that were omitted by the affiant, facts that could have been included in the affidavit, or contrary inferences that could have been made by the magistrate. *Id.* Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. *Id.* at 59. Thus, even in close cases we give great deference to a magistrate's determination of probable cause to encourage police officers to use the warrant process rather than making a warrantless search and later attempting to justify their actions by invoking some exception to the warrant requirement. *Id.* at 59-60.

42

## B. Affidavit

With these general principles in mind, we now turn to the affidavit in this case. The affidavit stated that a 1998 Ford Mustang had been secured by the Mansfield police department. The car was registered to murder victims Rick and Suzanna Wamsley and was controlled by Appellant, the suspected party. The affiant stated that he believed that the suspected party had possession of and was concealing within the vehicle (a) shoes consistent with imprints found at the crime scene, (b) clothing with blood stains consistent with those likely worn by an individual responsible for the assaults, and (c) blood in sufficient amounts to recover samples for DNA typing.

The affiant asserted that he had probable cause for the warrant because of the following facts: on December 11, 2003, Mansfield police officers responded to a 911 call where they discovered the bodies of Rick and Suzanna who appeared to have been murdered. Both of the victims had trauma about their bodies, and large quantities of blood was found at the crime scene. Crime Scene Personnel also found blood stained shoe prints inside the Wamsleys' home, and evidence was collected on the shoe prints. The affidavit also stated that Appellant met with investigators at the police department and advised them that he had possession of his parents' 1998 Ford Mustang and that it was parked outside. Through the investigation the police learned that the vehicle

was registered to Rick and Suzanna and had been missing from the crime scene. The affiant stated that it was believed that the actor(s) responsible for the Wamsleys' murders may have driven the vehicle from the crime scene after the murders, and that the car may now contain blood evidence.

**C. Analysis**

The primary issue is whether the search warrant was supported by probable cause. Appellant first contends that the warrant failed to establish probable cause that he had committed the offense and that evidence would be found in the vehicle. We disagree. Although the affidavit did not set forth facts showing that the search would yield evidence that Appellant committed the offense, the affidavit clearly complied with Texas Code of Criminal Procedure article 18.01(c). In addition to showing that the affiant had probable cause to believe that a specific offense had been committed, article 18.01(c) only requires that the affidavit set forth facts that the specifically "described property or item to be searched or seized constitute *either* evidence of an offense *or* evidence that a particular person committed that offense," and that the items constituting evidence are located in the particular thing to be searched. *See* TEX. CODE CRIM. PROC. ANN. art. 18.01(c) (emphasis added).

Here, the affidavit set forth sufficient facts to show that the affiant had probable cause to believe that two murders had been committed because Rick's

44

and Suzanna's bodies had been discovered at their home. The crime scene contained large quantities of blood, and a bloody footprint was found inside the residence. Thus, it may reasonably be inferred from these facts that the murderer or murderers got blood on themselves, their clothing, or shoes at some point while committing the murders. The affidavit also states that a 1998 Ford Mustang, registered to Rick and Suzanna, was missing from the murder scene. It is a reasonable inference from this fact that the Wamsleys' missing car may have been used by the murderer or murderers as a method to flee the scene, and, therefore, that it may contain blood evidence. Thus, the facts contained in the affidavit, and all reasonable inferences derived from them, establish probable cause that a crime had been committed, that the vehicle to be searched constituted evidence of the crime, and that there was a fair probability that items constituting evidence would be found in the car. *See* TEX. CODE CRIM. PROC. ANN. art. 18.01(c); *Rodriguez*, 232 S.W.3d at 64. Therefore, because the affidavit clearly set forth facts to satisfy each element of article 18.01(c), we hold that Appellant's contention is without merit.

Appellant further contends that probable cause was not established because the affiant purposefully omitted the fact that the police did not discover any signs of blood during their initial search of the vehicle. In order for an affiant's omission to be a basis to suppress a warrant, the appellant must

45

establish by a preponderance of the evidence that the omission was made knowingly, intentionally, or with reckless disregard for the truth in an attempt to mislead the magistrate. *Darby v. State,* 145 S.W.3d 714, 722 (Tex. App.—Fort Worth 2004, pet. ref'd). The omission of a material fact must affect the finding of probable cause in support of the issuance of the warrant in order for a warrant to be rendered invalid by such omission. *See id.*

Contrary to Appellant's contention, we determine that the omitted fact would not affect the finding of probable cause in support of the issuance of the warrant. In the affidavit, the affiant specifically stated that it was his belief that "blood in sufficient amounts to recover samples for DNA typing" would be found in the car. Even if the affiant had included the omitted information that an initial search had not resulted in the detection of blood, a magistrate could reasonably conclude that merely because obvious signs of blood were not detected, this did not necessarily mean that blood was not present. Indeed, the magistrate could have reasonably concluded that the police wanted to test the vehicle with chemicals, such as Luminol, that can reveal the presence of blood not visible to the naked eye but sufficient to conduct DNA typing upon. Thus, even if the information had been included, the magistrate could still have found probable cause to issue the warrant. Therefore, we conclude that the affidavit was not rendered invalid by the omission of this fact. *See id.*

46

In any event, even if the trial court did err in denying Appellant's motion to suppress the evidence seized from the Mustang, any error was harmless. We have already determined in our discussion of the previous point that the evidence derived from the search of the vehicle did not contribute to Appellant's conviction or punishment.

Because we determine that the facts actually in the affidavit, combined with all reasonable inferences that might flow from those facts, establish a "fair probability" that evidence of the murders would be found in the vehicle, we hold that the warrant was supported by probable cause. *See Rodriguez,* 232 S.W.3d at 60. Accordingly, we overrule Appellant's ninth and tenth points.

## IX. Conclusion

Having overruled all of Appellant's points, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL B:   LIVINGSTON, WALKER, and MCCOY, JJ.

LIVINGSTON, J. concurs without opinion.

DO NOT PUBLISH
TEX. R. APP. P. 47.2(b)

DELIVERED: March 13, 2008

47