COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-03-020-CR
  
  
DARRELL 
DARCELL DARBY A/K/A                                           APPELLANT
DARRELL 
DECELL DARBY
  
V.
  
THE 
STATE OF TEXAS                                                                  STATE
 
 
------------
 
FROM 
THE 396TH DISTRICT COURT OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
        Appellant 
Darrell Darcell Darby appeals his capital murder conviction. In four issues, he 
argues that the trial court erred in failing to suppress search and arrest 
warrants and that the evidence is legally and factually insufficient to support 
the verdict. We affirm.
Factual and 
Procedural Background
        Phong 
Huu Do and his wife Tuyet Mai Thi Tran opened the Vinh-Huong Bakery in 
Arlington, Texas, in 1996. Typically, Tran began her work day at the bakery 
around 9:00 a.m. after dropping off their children at school and Do would arrive 
at the bakery in time for her to pick the children up from school at 3:00 p.m. 
Do would then finish up the day’s work and begin preparing food for the next 
day’s sales. Do usually worked until 4:00 a.m., but it was not unusual for him 
to stay at the store until 6:00 or 7:00 a.m. Do often left the door to the store 
open as he worked because the kitchen grew hot.
        On 
the morning of May 23, 2001, Phan Thi Nguyen reported to work at the bakery only 
to find Do lying on the floor. When Do did not respond to Nguyen, she ran out of 
the bakery to seek help. Paramedics arrived on the scene and determined that Do 
was deceased. The ensuing police investigation discovered that Do suffered a 
single gunshot wound above his right ear, which incapacitated him immediately.
        After 
police determined that a credit card belonging to Do was missing, they contacted 
the credit card company to find out whether or not the card had been used at any 
time after the murder occurred. Police discovered that someone attempted to make 
several purchases at an Arlington K-Mart store and over the Internet using 
Do’s credit card. The Internet purchaser requested delivery of the merchandise 
to 1954 Pebble Creek, apartment number 152. Although the purchaser asked that 
delivery be made to Brittany Parker at the Pebble Creek address, police 
discovered that the apartment was actually registered to Kimberly Goode. Goode 
was later identified as Appellant’s girlfriend.
        This 
information, along with a crime stoppers’ tip from Marion Milton Scott, led 
police to develop Appellant as a suspect. Detective Danny Nutt made arrangements 
to meet with Scott, but before the meeting she was involved in a domestic 
disturbance and taken to the Arlington City Jail. Detective Jim Ford interviewed 
Scott while she was in the Arlington jail. Scott informed Detective Ford that 
Appellant told her about the robbery and murder on the afternoon of May 23, 
2001. According to Scott, Appellant “cased out” the store ahead of time and 
planned the robbery for a time when he knew Do would be alone at the store. 
Appellant told Scott that he intended to only rob Do, but when Do grabbed the 
gun, the two men struggled and the gun went off. Do fell to the ground and 
Appellant took money out of the cash register. After returning to the Pebble 
Creek Apartments and telling some friends what happened, Appellant went back to 
the bakery to wipe his fingerprints off of everything that he had touched. 
According to Scott, Appellant’s demeanor was calm and he did not seem upset. 
After telling Scott about the robbery and murder, Appellant asked Scott to go 
with him to K-Mart to see if the store would accept Do’s credit card. 
Appellant, Scott, and a friend named Roderick walked to the K-Mart where Scott 
purchased a compact disc player using Do’s credit card.
        Detective 
Ford obtained an arrest warrant for Appellant and a search warrant for Goode’s 
apartment on May 26, 2001. During the execution of the search warrant on May 27, 
2001, police seized: 1) Do’s wallet, driver’s license, various forms of 
identification, and business cards; 2) Goode’s laptop computer; and 3) 
handwritten notes regarding some of the Internet purchases made with Do’s 
credit card. Appellant surrendered to police on May 28, 2001, and provided, in 
pertinent part, the following confession:
  
Last 
Tuesday night I was at the Pebble Creek Apartments snorting cocaine. I borrowed 
a gun at about 7:00 P.M. or 8:00 P.M. from this dude who goes by the nickname 
“Rock”. Rock left the Pebble Creek Apartments after that and I did not see 
him again until I was back at the Pebble Creek Apartments about thirty minutes 
after the robbery when I gave him the gun back. . . . Rock told me that the gun 
wasn’t loaded. I told Rock that I was going to use the gun to rob the bread 
shore [sic] across the street from Pebble Creek. . . .
 
Last 
Tuesday night about 10:00 P.M. is when I decided to rob the bread store. I 
walked to the bread shop across the street from Pebble Creek by myself. Nobody 
went with me. Rock stayed behind at the Pebble Creek Apartments. . . . When I 
got to the bread store the front door was unlocked and propped open with a 
little piece of metal wedged under the bottom of the door. I walked in through 
the front door and the man was in the kitchen. . . . I walked up to the man and 
I was holding the gun in my right hand. The hammer on the gun was already cocked 
when Rock gave it to me and I didn’t know how to let the hammer down. I was 
two or three feet away from the man when I pointed the gun at him. I told him to 
give me all of the money. He said “okay, okay.” Then he reached up with his 
right hand and grabbed the gun and grabbed my right hand and he said “no, no, 
no, no, no.” Then the gun went off accidentally and shot him on the right side 
of the head. He was on his knees when he got shot. After he got shot he fell 
onto his back on the kitchen floor. . . . His head shook for a split second and 
then quit shaking and his head turned to the left and then he died. I took his 
black leather wallet out of his right back pants pocket. I saw this black bag 
sitting on the shelf in the kitchen and I took it also because I thought there 
was money in it. I took the wallet and the bag and I went out the back door 
which leads into a big hallway. I couldn’t find a way out or a door that 
wasn’t locked so I left the wallet and the black bag in the hallway and I left 
out of the front door of the bread store and ran straight back to Kim’s 
apartment. I told Kim what had happened. Kim was my girlfriend at that time and 
I was living with her at her apartment. She lives in apartment # 152 at the 
Pebble Creek Apartments. . . . I paged my friend Roderick and asked him to come 
over to Kim’s apartment. About five minutes later Roderick and Little Charles 
came to Kim’s apartment. . . . When Roderick and Little Charles got there I 
told them what had happened. I told them that I had accidentally shot the man 
during the robbery at the bread store across the street. Roderick asked me if I 
got anything during the robbery and I told him that I left a wallet and a black 
bag in the hallway behind the bread store. Roderick told me to go back and get 
the stuff. . . . I walked in the front door of the bread store by myself. I 
walked behind the counter and I got some paper money out of the cash register. . 
. . I went out the back door and walked down the hallway and got the wallet and 
the black bag. . . . Earlier I have [sic] been drinking beer, brandy, smoking 
marijuana, and snorting cocaine. When I met back up with Little Charles and 
Roderick in the Pebble Creek Apartments I got sick and threw up and passed out. 
Little Charles carried me into Kim’s Apartment. Roderick carried the wallet 
and the black bag into Kim’s Apartment. I woke up about 10 or 15 minutes later 
after Kim poured some water on me. Then we looked through the wallet and the 
black bag. There was a black Sony video camera but no money in the black bag. 
There was some paper money in his wallet. All together including the money from 
the cash register there was about $90.00. I gave the money to Kim. . . . Kim got 
the credit cards out of the wallet and ordered clothes, a TV, a stereo, and 
athletic shoes for me, herself, Roderick, and Little Charles through the 
internet using her lap top computer. . . . About 2:00 A.M. or 3:00 A.M. Kim and 
Roderick went to the Exxon . . . and used the credit card to get some cigarettes 
and Black and Mild cigars and a 12 pack of Dr. Pepper. . . . The next day me and 
Roderick went with this black female who he knows to Kmart at 360 and Arkansas 
to try to get some stuff with the dead man’s credit. We went to a register and 
the female was able to buy a radio using the credit card. Me and Roderick tried 
to get two bicycles but the credit card was declined.
 
 
        At 
trial, the State presented evidence that Appellant planned the robbery and 
“cased” the bakery with his friends weeks before committing the offense. 
Joshua Satterwhite testified that Appellant discussed robbing an Asian store 
across the street from Pebble Creek Apartments three or four weeks before the 
robbery and murder occurred. Satterwhite stated that he walked around the store 
with Appellant to look for unlocked doors and quoted Appellant as saying that if 
the victim of the robbery did not give Appellant the money, he would “shoot 
him in the ass.”
        A 
jury found Appellant guilty of capital murder and sentenced him to confinement 
for life. See Tex. Penal Code Ann. 
§ 12.31 (Vernon 2003), § 19.03(b) (Vernon Supp. 2004-05). This appeal ensued.
Sufficiency of the Evidence
        In 
his first two issues, Appellant contends that the evidence is legally and 
factually insufficient to support a conviction for capital murder because there 
was no evidence of a specific intent to cause the death of Do. In reviewing the 
legal sufficiency of the evidence to support a conviction, we view all the 
evidence in the light most favorable to the verdict in order to determine 
whether any rational trier of fact could have found the essential elements of 
the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 
319, 99 S. Ct. 2781, 2789 (1979); Burden v. State, 55 S.W.3d 608, 612 
(Tex. Crim. App. 2001). This standard gives full play to the responsibility of 
the trier of fact to resolve conflicts in the testimony, to weigh the evidence, 
and to draw reasonable inferences from basic facts to ultimate facts. Jackson, 
443 U.S. at 319, 99 S. Ct. at 2789. When performing a legal sufficiency review, 
we may not sit as a thirteenth juror, re-evaluating the weight and credibility 
of the evidence and, thus, substituting our judgment for that of the fact 
finder. Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. 
denied, 529 U.S. 1131 (2000).
        In 
reviewing the factual sufficiency of the evidence to support a conviction, we 
are to view all the evidence in a neutral light, favoring neither party. See 
Zuniga v. State, No. 539-02, 2004 WL 840786, at *4 (Tex. Crim. App. Apr. 21, 
2004). The only question to be answered in a factual sufficiency review is 
whether, considering the evidence in a neutral light, the fact finder was 
rationally justified in finding guilt beyond a reasonable doubt. Id. at 
*7. There are two ways evidence may be factually insufficient: (1) the evidence 
supporting the verdict or judgment, considered by itself, is too weak to support 
the finding of guilt beyond a reasonable doubt; or (2) when there is evidence 
both supporting and contradicting the verdict or judgment, weighing all of the 
evidence, the contrary evidence is so strong that guilt cannot be proven beyond 
a reasonable doubt. Id. “This standard acknowledges that evidence of 
guilt can ‘preponderate’ in favor of conviction but still be insufficient to 
prove the elements of the crime beyond a reasonable doubt.” Id. In 
other words, evidence supporting a guilty finding can outweigh the contrary 
proof but still be insufficient to prove the elements of an offense beyond a 
reasonable doubt. Id.
        In 
performing a factual sufficiency review, we are to give deference to the fact 
finder’s determinations, including determinations involving the credibility 
and demeanor of witnesses. Id. at *4; Cain v. State, 958 S.W.2d 
404, 407 (Tex. Crim. App. 1997). We may not substitute our judgment for that of 
the fact finder’s. Zuniga, 2004 WL 840786, at *4.
        A 
proper factual sufficiency review requires an examination of all the evidence. Id. 
at *7, 9. An opinion addressing factual sufficiency must include a discussion of 
the most important and relevant evidence that supports the appellant’s 
complaint on appeal. Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 
2003).
        In 
order to establish capital murder, the State was required to prove that 
Appellant intentionally or knowingly caused the death of Do in the course of 
committing or attempting to commit robbery. See Tex. Penal Code Ann. § 19.02(b)(1) 
(Vernon 2003), § 19.03(a)(2) (Vernon Supp. 2004-05). Intent is a fact question 
for the jury, and may be proven through evidence of the circumstances 
surrounding the crime. Brown v. State, 122 S.W.3d 794, 799 (Tex. Crim. 
App. 2003), cert. denied, 124 S. Ct. 1678 (2004); Flanagan v. State, 
675 S.W.2d 734, 744 (Tex. Crim. App. 1984) (op. on reh’g); Childs v. State, 
21 S.W.3d 631, 635 (Tex. App.—Houston [14th Dist.] 2000, pet. ref’d).
        Appellant 
first argues that there is no physical evidence to support the State’s claim 
that Appellant intentionally caused Do’s death. According to Appellant, the 
evidence is entirely consistent with his claim that the gun was accidentally 
fired when Do reached up with his right hand to grab Appellant’s hand and the 
gun. The State, on the other hand, contends that the physical evidence supports 
the jury’s verdict. A firearms and tool mark examiner as well as a trace 
anaylst with the Tarrant County Medical Examiner’s crime lab microscopically 
inspected latex gloves worn by Do at the time of the murder for gunpowder. They 
visually inspected the gloves for smoke, soot, gunpowder, or melting on the 
gloves to determine whether or not they were in close proximity of the gun when 
it was fired and found none of those substances on the gloves. The deputy chief 
medical examiner over Tarrant, Denton, and Parker counties testified that the 
autopsy indicates the gun was fired “an inch or two minimum distance and no 
more than a foot and a half to two and a half feet at the absolute outside” 
from Do’s head. Although the physical evidence is consistent with 
Appellant’s version of the facts, it is likewise consistent with the State’s 
theory. The jury could have construed the testimony regarding the physical 
evidence as proof that Do did not reach for the gun as Appellant claims.
        Appellant 
additionally points out that Scott’s testimony is consistent with 
Appellant’s statements regarding the accidental discharge of the gun and 
asserts that Satterwhite’s testimony is not evidence of Appellant’s intent 
for two reasons. First, Satterwhite testified that Appellant was laughing when 
he stated that he would shoot an uncooperative robbery victim, and that he 
believed Appellant was joking. Second, Satterwhite stated that the police told 
him he would go to jail if he did not cooperate with the investigation.
        The 
State argues that the jury could have inferred Appellant’s intent to kill Do 
based on the evidence presented at trial, pointing to several key pieces of 
evidence. The jury may have inferred Appellant’s intent to kill from his use 
of a handgun during the robbery. See Childs, 21 S.W.3d at. Intent to kill 
may be inferred from the use of a deadly weapon, unless in the manner of its use 
it is reasonably apparent that death or serious bodily injury could not result. Id.; 
see Flanagan, 675 S.W.2d at 744; Bell v. State, 501 S.W.2d 137, 
138-39 (Tex. Crim. App. 1973). Appellant claims that the gun was cocked because 
he was unable to let the hammer down on the gun. Consequently, we do not believe 
that it is reasonably apparent that death or serious bodily injury could not 
result; the jury was free to infer Appellant’s intent to kill Do from his use 
of a cocked handgun during the commission of the robbery.
        The 
State presented evidence that Appellant planned the robbery weeks in advance and 
obtained a firearm for that purpose. Satterwhite testified that Appellant 
planned the robbery in advance and Appellant admitted in his confession that he 
borrowed a gun from a friend named “Rock” on May 22, 2001, and told Rock 
that he was going to use it to rob the bakery. The record reflects that 
Appellant remained calm and dispassionate during his efforts to conceal the 
crime, while telling friends about the murder, and while making purchases with 
Do’s credit card. This behavior evidences a lack of remorse in the hours and 
days after the robbery and murder, which the jury could have relied on to infer 
intent. Hernandez v. State, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991) 
(stating that a jury may infer intent from any facts that tend to prove its 
existence, such as the acts, words, and conduct of the defendant), cert. 
denied, 504 U.S. 974 (1992).
        In 
this case, the jury apparently chose to disbelieve Appellant’s claim that the 
gunshot to Do’s head was accidental. The jury was free to infer Appellant’s 
intent from the evidence presented at trial, including Appellant’s use of a 
deadly weapon, his planning of the crime weeks in advance, his efforts to 
conceal the crime, his apparent lack of remorse during the days following the 
murder, testimony regarding the physical evidence, and the testimony of Scott 
and Satterwhite. See Torres v. State, 92 S.W.3d 911, 916-17 (Tex. 
App.—Houston [14th Dist.] 2002, pet. ref’d) (overruling the appellant's 
factual sufficiency challenge to a murder conviction despite lack of physical 
evidence when jury chose to believe statements made by the appellant to others).
        The 
fact finder is entitled to judge the credibility of the witnesses and may choose 
to believe all, some, or none of the testimony presented. See Chambers v. 
State, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). Viewing all the evidence 
in the light most favorable to the conviction, a rational trier of fact could 
find beyond a reasonable doubt that Appellant intended to kill Do. Viewing all 
the evidence neutrally, the State’s evidence is neither so obviously weak nor 
so greatly outweighed by contrary proof as to undermine confidence in the 
jury’s determination. We therefore conclude that the evidence supporting 
Appellant’s conviction for capital murder is legally and factually sufficient. 
We overrule Appellant’s first and second issues.
Motion to 
Suppress Arrest and Search Warrants
        In 
Appellant’s third and fourth issues, he contends that the trial court erred in 
failing to suppress evidence obtained as a result of the arrest warrant for 
Appellant and the search warrant for his girlfriend’s apartment because the 
affiant omitted information that was relevant to the determination of probable 
cause. The warrants prepared by Detective Ford relied, in part, on statements 
made by Scott claiming that Appellant confessed to the robbery and murder. 
Appellant asserts that Detective Ford failed to include important facts 
regarding Scott’s statements in the affidavit. Ford’s affidavit did not 
state that Scott used Do’s credit card to assist Appellant in purchasing items 
from K-Mart or that Scott was in jail for domestic violence when he interviewed 
her. Citing Franks v. Delaware, Appellant argues that Detective Ford’s 
omissions should be a basis to suppress those warrants and any evidence that 
developed as a result of their issuance. 438 U.S. 154, 985 S. Ct. 2674 (1978). 
Because Appellant relies on Franks, we construe his argument to be that 
the affidavit contained material omissions that were made intentionally, 
knowingly, or with reckless disregard for the truth. See id. at 155-56, 
985 S. Ct. at 2676. In Franks, the Supreme Court recognized that if an 
affirmative misrepresentation is knowingly included in a probable cause 
affidavit, and the misrepresentation is material and necessary to establishing 
the probable cause, the warrant is rendered invalid under the Fourth Amendment. Id. 
Appellant apparently acknowledges that the Texas Court of Criminal Appeals has 
not recognized that a Franks analysis pertains to omissions as well as 
false statements. See Massey v. State, 933 S.W.2d 141, 146 (Tex. Crim. 
App. 1996). Rather than cite this court to authority, Appellant argues that 
omissions “should be a basis” for suppressing the warrants.
        Although 
the court of criminal appeals has never directly decided whether a Franks analysis 
applies to omissions, the Fifth Circuit and Texas appeals courts have held that 
when a defendant seeks to suppress evidence lawfully obtained by a warrant, 
based on an alleged omission in the affidavit supporting the warrant, he must 
establish by a preponderance of the evidence that the omission was made 
knowingly, intentionally, or with reckless disregard for the truth in an attempt 
to mislead the magistrate. See United States v. Martin, 615 F.2d 318, 328 
(5th Cir. 1980) (adapting the standard for reviewing affirmative 
misrepresentations in a search warrant to include omissions); Blake v. State, 
125 S.W.3d 717, 723-24 (Tex. App.—Houston [1st Dist.] 2003, no pet.); Heitman 
v. State, 789 S.W.2d 607, 610 (Tex. App.—Dallas 1990, pet. ref'd); Melton 
v. State, 750 S.W.2d 281, 284 (Tex. App.—Houston [14th Dist.] 1988, no 
pet.). We agree with these courts, and therefore analyze Detective Ford’s 
omissions under Franks. 438 U.S. 154, 985 S. Ct. 2674 (1978).
        In 
this case, the record does not reflect, by a preponderance of the evidence, that 
Detective Ford intentionally or knowingly, with reckless disregard for the 
truth, made any misstatements or omissions in the affidavit that would affect 
the finding of probable cause in support of the issuance of the warrants. Given 
the corroboration of Scott’s statements and the consistency of her statements 
with the particular facts of the offense as outlined in the affidavit and other 
evidence gathered during the investigation and discussed in the affidavit, 
Appellant has not shown that Detective Ford’s omissions were made 
intentionally or in reckless disregard of the truth in an attempt to mislead the 
magistrate. See Morris v. State, 62 S.W.3d 817, 825 (Tex. App.—Waco 
2001, no pet.) (holding that omission of fact that informant offered information 
when being questioned by his employer about stealing, did not sufficiently 
undermine informant's credibility as to render warrant invalid for lack of 
probable cause); Hackleman v. State, 919 S.W.2d 440, 449 (Tex. 
App.—Austin 1996, pet. ref’d) (holding that affiant's omission that informer 
may have been in custody when he gave his information was not sufficient to 
defeat probable cause, which was shown by remainder of affidavit in support of 
search warrant). Furthermore, Appellant has not shown that the affidavit, if 
supplemented with the omitted information, would be insufficient to support a 
finding of probable cause. See Hackleman, 919 S.W.2d at 449. We conclude 
that the affidavit was not rendered invalid by the omission of material facts. 
Appellant's third and fourth issues are overruled.
Conclusion
        Having 
overruled each of Appellant’s four issues, we affirm the trial court’s 
judgment.
  
   
                                                                  DIXON 
W. HOLMAN
                                                                  JUSTICE
   
 
PANEL 
B:   HOLMAN, GARDNER, and WALKER, JJ.
 
PUBLISH
 
DELIVERED: 
August 25, 2004