

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00448-CR

———————————————

NICHOLAS RYAN HESTER, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1549191R

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

The State charged Appellant Nicholas Ryan Hester by indictment with intentionally killing Chaney Hawthorne in the course of committing or attempting to commit robbery and with altering, destroying, or concealing a human corpse with intent to impair its verity or availability as evidence. *See* Tex. Penal Code Ann. §§ 19.03(a)(2), 37.09(c). The indictment included a habitual offender notice. The jury found Appellant guilty as charged in the indictment, and the trial court sentenced him to life imprisonment for capital murder and to sixty years' confinement for tampering with a corpse. Appellant timely appealed.

In three issues, Appellant challenges the sufficiency of the evidence supporting his convictions (issues one and three) and contends that the trial court provided "erroneous and incomplete" jury instructions by not sua sponte instructing the jury in the capital murder charge on the lesser-included offense of felony murder (issue two). Because the evidence is sufficient to support Appellant's two convictions and the trial court had no duty to sua sponte instruct the jury on the lesser-included offense of felony murder, we affirm the trial court's judgments.

## BACKGROUND FACTS

Before his death, twenty-one-year-old Hawthorne lived with his grandparents in Benbrook but often stayed with friends. Hawthorne had struggled with drug addiction and, after a near-fatal overdose in April 2016, his grandparents sent him for

inpatient treatment in Florida. In the summer of 2016, he returned to Tarrant County and was in the outpatient phase of treatment. He overdosed again in mid-July.

Hawthorne's grandparents had bought him a gray Ford pickup truck in March or April of 2016. Hawthorne treated his truck "[l]ike it was his baby" and "was very picky with it."

On August 24, 2016, Hawthorne telephoned his grandmother and told her that the truck's service light was on. His grandmother suggested that Hawthorne call a mechanic friend of the family. Hawthorne and the mechanic arranged to meet at the grandparents' house at 8:00 a.m. the following day.

Around 10:56 p.m. on August 24, Hawthorne and his friend Colton Carnie spoke on the phone, and Hawthorne told Carnie that he was on his way to Carnie's house. They texted back and forth from 11:12 to 11:18 p.m. When Hawthorne failed to arrive, Carnie called him several times, worried. The next day, he tried unsuccessfully to find Hawthorne.

Hawthorne did not arrive for the 8:00 a.m. meeting at his grandparents' house. His grandmother tried unsuccessfully to reach him, and, after speaking to Carnie, she called the police and filed a missing person's report.

Hawthorne's grandmother paid for his cell phone, and she had online access to his call logs. She printed out the records and gave those to the police. She also gave the police information about his truck.

One of the last phone numbers on Hawthorne's call log was registered to Davien Powell. A call was made to Powell's phone from Hawthorne's phone at 11:48 p.m. on August 24. Powell lived in a house on Trail Lake Drive in Fort Worth, and Appellant lived in Powell's garage. Appellant did not have a vehicle.

Powell's phone was not at his home at 11:48 p.m., but Hawthorne's phone was pinging in the location of Powell's home. After the phone call to Powell's phone, phone records show that his phone traveled back to the vicinity of his home. "[T]here was no outgoing activity on" Hawthorne's phone after an inbound call from Powell's phone at 2:01 a.m. on August 25, 2016.

Late in August 2016, Powell's then-girlfriend, Edith Tribble, awoke early in the morning and found Powell in the garage scrubbing the floor with bleach. She had never seen Powell clean the garage at all, much less like that. Later that same day when she came home from work, she noticed that couches that had been in the garage were no longer there and that their daughter's mattress was missing from the house. She never saw Appellant again until the trial.

On August 26, 2016, Appellant visited friends in Maud, Texas. Appellant drove there in a gray Ford pickup truck. He told Elizabeth Goodrich and her significant other, with whom he stayed, that he needed to "get away for a while." Appellant initially told his friends that he had bought the truck, but after Goodrich told him "that he better not be lying about where the truck came from," "nobody better be coming to [her] house," and "[i]t better not be stolen," he told her that the

4

truck "belonged to a friend of his and that [the friend] was going to sell it to him." Goodrich later told Appellant again that he "better not give [her] no trouble with that truck," and he told her that "he ain't going to have no trouble about the truck." Appellant also told her (regarding the truck's owner), "[T]he motherfucker is dead[;] I left his ass in the woods." Goodrich explained at trial, "The entire conversation was, [in Appellant's exact words,] he's dead, I left him in the woods. And I said, how the fuck you know he's dead? And he said, because I killed the motherfucker, you ain't got nothing to worry about." On the last day she saw Appellant, he told her both that he left the truck's owner on the side of the road and that the owner was really still alive in Fort Worth and that Appellant had been "just playing" with her.

Appellant first told Goodrich's son Ricky Ross that he bought the truck by working in the Fort Worth area, but later Appellant, "all paranoid and . . . looking everywhere like this and stuff," told Ross, "[S]ee that truck right there? . . . I killed [the] man that owned that truck." Ross also testified that Appellant told him that he "beat [the truck's owner] and then left him in the woods for the hogs or whatever, something like that." Ross explained that Appellant told him he killed the truck's owner because he needed a way to get back to Maud from Fort Worth; "he just needed a ride."

Appellant gave a ride to Goodrich's friend Jacy Miller, and Miller saw in the window behind her a fast-food visor with the name "Chaney" on it. Appellant told her that he got the truck from his father. She later overheard Appellant's

5

conversation with another friend in which Appellant told the friend that "he wouldn't have to worry about that truck being reported stolen[;] the driver had been taken care of."

On August 27, Appellant asked Goodrich if he could clean out the truck in the burn pile in her backyard. Appellant cleaned out the truck and put things in the burn pile. Appellant tried to sell Goodrich's significant other the truck. Appellant later tried to sell Miller's dealer the brush guard attachment from the truck, and the dealer told him to put it behind the house.

In the early hours of August 31, 2016, Deputy Brent Caudle of the Bowie County Sheriff's Department saw a gray Ford pickup truck on the side of US Highway 67. The truck appeared to be abandoned or disabled. Caudle turned around to investigate and asked dispatch to run a registration check on the license plate. Dispatch reported that the truck was associated with Hawthorne, who had been reported as a missing person. Around the same time, Caudle received a call from dispatch about a suspicious person three miles away. Caudle left to investigate, and when he returned a few minutes later, the truck was gone.

Caudle spotted the truck again at a nearby gas station. He stopped the driver—Appellant—and "explain[ed] to him that he [was] being detained because the vehicle that he [was] operating c[a]me back to a missing person." Appellant told Caudle that he had dropped Hawthorne off at a nearby low-water bridge to fish. Appellant also told Caudle that Hawthorne was on acid. Caudle ran a check on Appellant and, upon

6

learning that he had active warrants, arrested him. Caudle conducted a search incident to arrest. Appellant was wearing baggy sweatpants, and hanging from the drawstring on the inside of his pants was a bag containing Hawthorne's driver's license and insurance card. Caudle drove to the area by the low-water bridge and did not see Hawthorne.

Captain Robbie McCarver of the Bowie County Sheriff's Department interviewed Appellant after he was jailed. Appellant told McCarver that he and Hawthorne met in Fort Worth and went to Bowie County together to visit Candy Hagler and that Hawthorne did not want to be seen by law enforcement. Hagler told McCarver that she did not know Hawthorne or recognize the photo of him that the captain showed her. While Appellant was in jail in Bowie County, he spoke to his mother from jail. He told her, "I ended up with horns. I thought I was supposed to be an angel." He also said, "I am going to need another vehicle now that my truck's gone."

On October 13, 2016, about seven weeks after Hawthorne disappeared, Jesse Castillo found human remains in a wooded area north of his Fort Worth home. His son and a friend had been playing in the area and told him they had seen what they thought might have been Halloween decorations. Castillo called the police after seeing the boys' discovery. He testified that "the body was in one location and the head was in another, and then . . . the bones were kind of spread between the head and the body itself." Using dental records, police matched the remains to Hawthorne.

Fort Worth Police Department (FWPD) homicide detective Kyle Sullivan testified that tree limbs, mattresses, and a crib were found piled on top of the remains. FWPD crime scene officer Danielle McConahay testified that the remains were scattered over a large field. She described State's Exhibit 89, a photograph, as "a pile of branches and other miscellaneous materials that were on top of a bunch of the skeletal remains," and it appeared to her that someone had deliberately tried to cover up the body. She believed that skeletal remains found nearby had been dragged away from the pile by animals. Similarly, forensic anthropologist Dana Austin testified that a blanket was found under the remains, and a jumper that a baby goes in, a mattress, and branches were piled on top of it. She stated that "this was an attempt to conceal a body, place a body out there, pile some things on top of it, pile the wood on top of it, so that it would be . . . obscured." Because of the state of the remains and signs of animal scavenging, the medical examiner could not determine the cause or manner of death.

Tribble identified some items found near the remains as Powell's shirts and a work vest and Lake Como blanket that had been in the garage. The remains were found about four minutes from Powell's house by car.

FWPD Detective Sullivan interviewed Appellant, who admitted to having sold Hawthorne drugs, having stolen his truck, and having used his cell phone to call Powell—all on the night Hawthorne went missing. Appellant claimed that he and Hawthorne spent a few days doing drugs together and said that he had last seen

8

Hawthorne at the gas station where they had originally met and where the drug buy occurred. Appellant said that he used Hawthorne's phone to call Powell before he dropped Hawthorne off at the gas station. Appellant said in the interview that he had lied to his friends "about the whole truck situation" because he did not want to incriminate himself on another charge that he claimed had "nothing to do with any kind of murder, assault, or any kind of violence." Appellant explained to the officers that he had Hawthorne's driver's license, insurance card, and other items because they were in the truck. Appellant stated in the interview, "If I had killed [Hawthorne], bro, you think I'm gonna be driving his truck?" But Sullivan also testified that Goodrich told him that Appellant told her that he had killed Hawthorne and left him in the woods. Sullivan further testified that people who die of an overdose are not typically left where they will be hard to find.

## DISCUSSION

### I. Sufficiency of the Evidence to Support the Convictions

In his first issue, Appellant contends that the evidence is insufficient to support the jury's verdict that he was guilty of capital murder because there is no evidence that he had specific intent to kill Hawthorne, and in his third issue, he contends that the evidence is insufficient to support the tampering conviction "because the State cannot establish the time, place[,] and manner of Hawthorne's death."

9

### A.	Standard of Review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV.	In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved

10

any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). We must scrutinize circumstantial evidence of intent as we do other elements of an offense. *Laster v. State*, 275 S.W.3d 512, 519–20 (Tex. Crim. App. 2009). But when a record supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

## B.    Sufficient Evidence of Capital Murder

In his first issue, Appellant complains that the evidence is insufficient to support the guilty verdict for capital murder. He contends that there is no evidence to show his specific intent to kill because there is no definitive cause of Hawthorne's death and no evidence about the circumstances of it. Appellant points out that Hawthorne could have died of a drug overdose.

The indictment alleged that Appellant intentionally caused Hawthorne's death "by a manner and means unknown to the grand jury" while "in the course of committing or attempting to commit . . . robbery." *See* Tex. Penal Code Ann. §§ 19.02(b)(1) (providing that a person commits murder by intentionally . . . causing

11

another person's death); 19.03(a)(2) (providing that a person commits capital murder if he intentionally commits murder under section 19.02(b)(1) in the course of committing a felony such as robbery). The intentional murder element of capital murder is a "result of conduct" offense, which means the culpable mental state relates to the result—causing the death. *Roberts v. State*, 273 S.W.3d 322, 328 (Tex. Crim. App. 2008), *abrogated on other grounds by Ex parte Norris*, 390 S.W.3d 338, 341 (Tex. Crim. App. 2012); *Hughes v. State*, 897 S.W.2d 285, 295 (Tex. Crim. App. 1994). A person acts "intentionally" with respect to a result of his conduct when it is his "conscious objective or desire to . . . cause the result." Tex. Penal Code Ann. § 6.03(a).

An intent to kill "may . . . be inferred from circumstantial evidence, including [a defendant's] acts and words." *Ex parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014). The jury may also consider events that occurred before, during, and after the offense. *Modarresi v. State*, 488 S.W.3d 455, 463 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (citing *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004)). Motive is "a significant circumstance indicating guilt." *Weinstein*, 421 S.W.3d at 668 (internal quotation marks and citation omitted). "Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are [also] probative of wrongful conduct and . . . circumstances of guilt," *Guevara*, 152 S.W.3d at 50, as well as "strong evidence of [a defendant's] consciousness of guilt." *Weinstein*, 421 S.W.3d at 668. Further, evidence showing no

12

remorse indicates intent. *See Darby v. State*, 145 S.W.3d 714, 721 (Tex. App.—Fort Worth 2004, pet. ref'd). The issue here is whether the evidence supports beyond a reasonable doubt the finding that Appellant intended to kill Hawthorne. *See Fuentes v. State*, 991 S.W.2d 267, 272 (Tex. Crim. App. 1999) ("The distinguishing element between felony murder and capital murder is the intent to kill.").

The evidence is sufficient to show Appellant's specific intent to kill Hawthorne. *First*, the jury heard evidence of murder: Appellant's friends testified that he admitted killing Hawthorne. *Second*, the jury heard evidence of motive: Ricky Ross testified that Appellant said that he killed Hawthorne because he needed transportation back to Maud. *Third*, the jury heard evidence of Appellant's hiding and destroying evidence: Appellant's friends in Maud testified about his burning items from the truck, getting rid of the truck's brush guard, and trying to sell the truck. Additionally, FWPD personnel and anthropologist Dana Austin testified about large items being piled on top of the body in the woods in what seemed a deliberate attempt to cover up and conceal it, and Detective Sullivan testified that people who overdose are not commonly left where they will be hard to find. Powell's former girlfriend also recognized some items found with the remains that had been Powell's or in his garage. *Fourth*, the jury heard evidence of several inconsistent statements by Appellant regarding how he obtained the truck, whether Hawthorne was dead or alive, and where Hawthorne was. *Fifth*, the jury heard evidence showing a lack of remorse. Appellant told his friends that he "killed the motherfucker," "left his ass in the

13

woods," and "beat [Hawthorne] and then left him in the woods for the hogs" and that Hawthorne "had been taken care of." Applying the appropriate standard of review, we hold that the evidence is sufficient to support the jury's capital murder verdict—including the element of specific intent to kill—beyond a reasonable doubt. *See Darby*, 145 S.W.3d at 721; *Torres v. State*, 92 S.W.3d 911, 916–17 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (overruling factual sufficiency challenge despite alleged lack of physical evidence tying defendant to murder). We overrule Appellant's first issue.

## C. Sufficient Evidence of Tampering with a Corpse

In his third issue, Appellant contends that the evidence is insufficient to support the jury's finding of guilty for tampering with a corpse when the evidence was insufficient to establish the time, place, and manner of Hawthorne's death. Section 37.09 of the Texas Penal Code provides that "[a] person commits an offense if the person[,] knowing that an offense has been committed, alters, destroys, or conceals any . . . thing with intent to impair its verity, legibility, or availability as evidence in any subsequent investigation or official proceeding related to the offense." Tex. Penal Code Ann. § 37.09(d)(1). If "the thing altered, destroyed, or concealed is a human corpse, . . . the offense is a" second-degree felony; otherwise, it is a third-degree felony. *Id.* § 37.09(c). The indictment charged that on or about August 24, 2016, knowing that a murder had been committed, Appellant "alter[ed], destroy[ed], or conceal[ed] a human corpse, with intent to impair its verity or availability as evidence in a subsequent investigation or any [related] official proceeding." *See id.* § 37.09(c),

14

(d)(1). Appellant argues that the evidence is not sufficient to show that a murder had been committed before the tampering offense began, focusing on the lack of evidence of a definitive cause of death, ambiguity of one of his remarks about killing Hawthorne, the scattering of the remains, and evidence of animal scavenging.

From all of the evidence, the jury could have inferred that Appellant killed Hawthorne in Powell's garage, transported Hawthorne's body to the woods and dumped it there, and covered the body with a crib, a mattress, and tree limbs to delay the body's discovery and to give himself time to flee. Applying the appropriate standard of review, we therefore hold that the evidence is sufficient to support Appellant's conviction for tampering with a corpse. *See, e.g.*, *Berry v. State*, Nos. 14-15-00398-CR, 14-15-00399-CR, 14-15-00400-CR, 2016 WL 4036053, at *3 (Tex. App.—Houston [14th Dist.] July 26, 2016, no pet.) (mem. op., not designated for publication) (holding evidence sufficient for tampering and stating, "The jury could well have considered all of the evidence discussed above concerning the convictions for murder and arson in concluding that appellant endeavored to conceal proof of her crime."); *Burks v. State*, No. 14-14-00166-CR, 2015 WL 4463746, at *2–4 (Tex. App.—Houston [14th Dist.] July 21, 2015) (mem. op., not designated for publication) (rejecting appellant's argument that there was no evidence that the complainant died in appellant's car and therefore no evidence that he tampered with a corpse by pushing the body out of his car), *aff'd*, No. PD-0992-15, 2017 WL 3443982 (Tex. Crim. App.

15

June 28, 2017) (op. on reh'g) (per curiam) (not designated for publication). We overrule Appellant's third issue.

## II. Omission of Felony Murder Instructions from the Jury Charge

In his second issue, Appellant asks whether the trial court committed reversible jury-charge error in its instructions on the lesser-included offense of murder when it failed to include felony murder within either the abstract definitions or the application paragraphs. In response, the State argues that the trial court was not required to *sua sponte* instruct the jury on the lesser-included offense of felony murder.

Unless a particular statute places a sua sponte duty on a trial court to give an instruction, the trial court generally need not instruct the jury sua sponte on unrequested traditional defenses and defensive issues because they are not "law applicable to the case." *See* Tex. Code Crim. Proc. Ann. art. 36.14; Tex. R. App. P. 33.1; *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013); *Oursbourn v. State*, 259 S.W.3d 159, 180 (Tex. Crim. App. 2008). A defendant who fails to ask for an instruction on such issues, or to object to their exclusion, forfeits the alleged error on appeal; thus, we do not engage in an *Almanza* egregious-harm review. *See* Tex. R. App. P. 33.1; *Vega*, 394 S.W.3d at 519; *Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998); *Almanza v. State*, 686 S.W.2d 157, 171–74 (Tex. Crim. App. 1985) (op. on reh'g).

Caselaw treats lesser-included-offense instructions like defensive issues because a lesser-included offense is not "applicable to the case" for jury-charge purposes

16

unless the defense asks that it be included in the jury charge. *Tolbert v. State*, 306 S.W.3d 776, 781 (Tex. Crim. App. 2010). If neither side requests a lesser-included instruction, the trial court need not submit one sua sponte. *See Delgado v. State*, 235 S.W.3d 244, 250 (Tex. Crim. App. 2007); *see also Tolbert*, 306 S.W.3d at 781. Moreover, if the defense did not request a lesser-included instruction, its omission is not error that the defense can successfully claim on appeal. *See Delgado*, 235 S.W.3d at 250; *see also Tolbert*, 306 S.W.3d at 780. As the Texas Court of Criminal Appeals recently stated after discussing instructions on mistake of fact, extraneous-offense burdens of proof, and lesser-included offenses, "If the defendant fails to object to the absence of these kinds of instructions in the jury charge, the trial court will have committed no error at all; a trial court does not err by failing to instruct the jury on an issue that was, by virtue of the defendant's silence, simply inapplicable to the case." *Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018).

Because Appellant did not request an instruction on the lesser-included offense of felony murder, we hold that the trial court did not err by not sua sponte including it in the jury charge. *See, e.g.*, *Bright v. State*, No. 07-15-00118-CR, 2016 WL 3659970, at *8 (Tex. App.—Amarillo June 29, 2016, pet. ref'd) (mem. op., not designated for publication) (holding same in capital murder case in which the trial court did not instruct the jury on felony murder but did instruct the jury on other lesser-included offenses of murder). We overrule Appellant's second issue.

**CONCLUSION**

Having overruled Appellant's three issues, we affirm the trial court's judgments.


/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: January 30, 2020